# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**
June 20, 2012

No. 10-41320

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

Plaintiff-Appellee

v.

RYAN JAMES MUDD,

Defendant-Appellant

Appeal from the United States District Court
for the Southern District of Texas

Before STEWART, ELROD, and SOUTHWICK, Circuit Judges.

CARL E. STEWART, Circuit Judge:

Defendant-Appellant Ryan James Mudd appeals his conviction and sentence on a single count of possession of a firearm by a felon, in violation of 18 U.S.C. § 922(g)(1).  Mudd argues that: (1) there was insufficient evidence to support his conviction; and (2) a conflict exists between the district court's oral pronouncement at sentencing and written judgment.  For the following reasons, we AFFIRM Mudd's conviction, VACATE his sentence in part, and REMAND this case to the district court.

## I.

On February 12, 2009, two Texas parole officers and a Corpus Christi police officer performed  a consensual home visit and search of the home Mudd

shared with his girlfriend, Ashley Higgs, an employee of Hobby Lobby. Mudd's mother, Debbie Mudd, owned and sometimes lived at the home. The house had previously been owned by Mudd's deceased father, a former police officer who collected guns and stored them around the house. Prior to the home visit, Mudd and Higgs had lived at the house for two and a half months. Sammy Pena, a friend of Mudd's, also lived at the house for about three weeks, until Mudd acrimoniously kicked him out at the end of January 2009 because of Pena's threatening behavior. A number of other people had also been permitted to occasionally reside in the house.

The house was messy and cluttered. In the very cluttered bedroom shared by Mudd and Higgs, officers found Mudd's wallet and identification. At Mudd's trial, Police Officer Roger Parker described a storage compartment in the room under a bay window. The lid was cracked open an inch or two, and did not close completely. Officer Parker described that a person sitting on the bed could see inside of the storage compartment, and that once he stooped down slightly, he could see inside of it. At the top of the storage unit was a partially unzipped black bag with the stock of a shotgun sticking out of it.

Parole Officer Bronia Brown testified that the bay window storage compartment was an older furniture piece that did not completely close. A black bag was visible when looking at the compartment. Inside of the black bag was a shotgun. Beneath the black bag was a Hobby Lobby shopping bag.

The Government's photographic exhibits corroborate the testimony of Officer Parker and Officer Brown with respect to the appearance of the storage compartment. They show the storage compartment partially opened, directly next to the bed and beneath a large window. A black bag is visible within the partially open storage compartment.

The stock of the shotgun discovered in the storage compartment was wrapped in black tape, and the serial number was obliterated. ATF Special

No. 10-41320

Agent Steven Waters testified that the tape did not appear to be old, worn, or in poor condition. He further testified that old black electrical tape tends to crack over time; however, the tape that was wrapped around the shotgun was new and very flexible. It was ultimately determined that the shotgun had originally been purchased by an elderly Michigan man, who had traded it several years earlier.

When confronted about the weapon, Mudd denied all knowledge of it. Mudd was arrested that evening. In an interview, Agent Waters told him that a sawed-off shotgun had been found in the bedroom, but did not reveal the specific location.

Mudd made phone calls from jail to Higgs and his sister, Ronya Aigner, which were recorded. Per Agent Waters's request, an investigator with the Nueces County Sheriff's Office transferred a number of these conversations to compact discs, parts of which were played at trial before the jury.

In one call to Aigner, Mudd denied knowledge of the gun and where it was found, and speculated that someone had planted it. In another conversation, Mudd told Aigner that their mother might accept responsibility for the gun and possibly receive a misdemeanor.

In a conversation with Higgs, Mudd stated that he thought he could beat the charges because the house belonged to his mother and the gun could have been there for years. Mudd told Higgs that the gun had been discovered in a black bag. He asked her to take pictures of the cobwebs on the bag, in order to prove that the bag had been in the bedroom for a long time. Mudd also told her that he did not know what bag "they" were talking about.

Agent Waters testified that he interviewed Mudd a second time on March 11, 2009. He confronted Mudd about identifying the location of the firearm during his calls from jail. Waters pointed out that at the time of his arrest, Mudd had told him that he did not know the location of the firearm. Mudd told Waters that his parole officer had visited him in jail two weeks prior to the

3

No. 10-41320

interview and told him where the firearm was discovered. Waters told Mudd that his facts did not "add up" because Mudd told Higgs the location of the firearm in a phone call two days after his arrest. Mudd had no further comment at that time. At a subsequent interview after his indictment, Mudd told Waters that a police officer at the scene told him where the shotgun was discovered.

On September 28, 2010, a jury found Mudd guilty of possession of a firearm by a convicted felon. On December 15, 2010, Mudd was sentenced to 77 months' imprisonment and three years' supervised release. This appeal followed.

## II.

### A.

"When reviewing sufficiency of the evidence, we will affirm if a reasonable trier of fact could have concluded that the evidence established the essential elements of the offense beyond a reasonable doubt." *United States v. Santillana*, 604 F.3d 192, 195 (5th Cir. 2010). "We consider all evidence, credibility determinations, and reasonable inferences drawn therefrom in the light most favorable to the prosecution." *Id.* "The jury may choose among reasonable constructions of the evidence: The evidence need not exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt." *Id.* "We will reverse, however, if after viewing the evidence in the light most favorable to the prosecution, the evidence still gives equal or nearly equal support to a theory of guilt and a theory of innocence, because in that event, a reasonable trier of fact must necessarily entertain reasonable doubt." *Id.* (internal citations omitted).

### B.

"In order to convict one for felon in possession of a firearm, the government must prove that the defendant (1) has been convicted of a felony; (2) possessed a firearm in or affecting interstate commerce; and (3) knew that he was in

possession of the firearm." *United States v. Ybarra*, 70 F.3d 362, 365 (5th Cir. 1995). "Possession of the firearm may be actual or constructive." *Id.* "Constructive possession is 'ownership, dominion, or control over the contraband itself, or dominion or control over the premises in which the contraband is concealed.'" *Id.* (quoting *United States v. Smith*, 930 F.2d 1081, 1085 (5th Cir. 1991)) (emphasis omitted).

"In determining what constitutes dominion and control over an illegal item, this Court considers not only the defendant's access to the dwelling where the item is found, but also whether the defendant had knowledge that the illegal item was present." *United States v. De Leon*, 170 F.3d 494, 497 (5th Cir. 1999). "[M]ere control or dominion over the place in which contraband or an illegal item is found by itself is not enough to establish constructive possession when there is joint occupancy of a place." *United States v. Mergerson*, 4 F.3d 337, 349 (5th Cir. 1993) (emphasis omitted). "In our previous joint occupancy cases, this court has adopted a commonsense, fact-specific approach to determining whether constructive possession was established." *Id.* (internal quotation marks omitted). "We have found constructive possession in such cases only when there was some evidence supporting at least a plausible inference that the defendant had knowledge of and access to the weapon or contraband." *Id.*

This court has likewise determined that mere proof of dominion over a place or vehicle is insufficient to sustain a conviction, of which knowing possession is an element, where the contraband at issue was discovered in a hidden compartment. "[I]n order to satisfy the knowledge element in hidden compartment cases, this Court has normally required additional 'circumstantial evidence that is suspicious in nature or demonstrates guilty knowledge.'" *United States v. Resio-Trejo*, 45 F.3d 907, 911 (5th Cir. 1995) (quoting *United States v. Anchondo-Sandoval*, 910 F.2d 1234, 1236 (5th Cir. 1990)). Inconsistent statements and implausible explanations are among the behaviors previously

No. 10-41320

recognized in this circuit as circumstantial evidence of guilty knowledge. *See United States v. Ortega Reyna*, 148 F.3d 540, 544 (5th Cir. 1998).

Turning now to the present case, we conclude that the totality of the evidence presented at trial creates at least a plausible inference that Mudd had knowledge of and access to the weapon. First, two days after Mudd's arrest, he identified in a phone conversation that the shotgun was found in a black bag, despite his unequivocal denials at the time of his arrest of knowledge of the weapon and its location. When confronted with this discrepancy a month after his arrest, Mudd claimed that his parole officer had informed him of the location of the weapon two weeks earlier. Although the Government did not produce evidence refuting Mudd's claim that his parole officer told him the location of the weapon two weeks after his arrest, Mudd's allegation does not explain how he came to know the location of the weapon in a black bag two days after police initially discovered it in his bedroom and he denied all knowledge of it. Given these inconsistencies, it was reasonable for the jury to conclude that Mudd's explanations lacked credibility and to infer that Mudd was aware of and had access to the shotgun prior to its discovery by law enforcement.

Additionally, the jury was presented with evidence that, despite the defense's suggestion that the gun had belonged to Mudd's deceased father and essentially been forgotten, the gun had only recently been handled and placed into the bay window storage compartment. For instance, Agent Waters testified that the black electrical tape wrapped around the shotgun was new, flexible, and in good condition. Parole Officer Brown testified that a Hobby Lobby shopping bag was found underneath the weapon. Although Higgs testified that Debbie Mudd also worked and shopped at Hobby Lobby, suggesting that the shopping bag beneath the shotgun could have belonged to Debbie, the jury could reasonably have determined that Higgs's testimony was not credible given her relationship to the defendant. When taken together, the new tape on the

6

No. 10-41320

shotgun and Hobby Lobby shopping bag found beneath it create a plausible inference that the gun had only been in the storage compartment for a short time.

Moreover, there is evidence that the weapon was stored in reasonably plain view of a person in Mudd's bedroom. The shotgun was found in a compartment beneath a window, and the lid of the compartment was partially open. The stock of the shotgun was protruding from a partially unzipped black bag. Officer Parker testified that a person sitting on the bed could see inside of the compartment, as he did while stooping. The jury was permitted to regard this testimony as credible. Although Parole Officer Brown did not corroborate that the weapon itself was plainly visible, she did not dispute the assertion and acknowledged that the black bag was plainly visible. Moreover, the Government's photographic exhibits clearly show that the storage compartment was large, conspicuous, adjacent to the bed, and partially open.[1] Through this opening, the black bag in which the sawed-off shotgun was discovered is clearly visible. The evidence presented regarding the position and appearance of the storage compartment and the visibility of the weapon is sufficient to create a plausible inference that Mudd, who lived in the bedroom for more than two

---

[1] Following briefing and oral argument, we reviewed the original photographic exhibits submitted at trial by the Government. Exhibit 03 shows Mudd's bedroom. Mudd's bed is adjacent to the partially open storage compartment, which is beneath the room's large window. Exhibit 04 is a closer view of the storage compartment. The very large storage compartment is directly next to two end tables beside Mudd's bed, on which a portable heater, plate, and household goods rest. The storage compartment is open, and a black bag is clearly visible inside. Exhibit 05 shows the storage compartment with the lid completely open. Inside is the black bag with the shotgun partially protruding out of it. Exhibit 06 is a photograph of the shotgun and bag placed on the bed. The shotgun is long, large, and appears heavy. The end of the shotgun is wrapped in black tape. The black bag which had enclosed the shotgun is also very large. We conclude that the photographic exhibits corroborate Officer Parker's testimony that, by virtue of the partially open storage compartment, the firearm was in reasonably plain view of a person in Mudd's bedroom.

months and presumably sat on his bed at least once, was aware of the presence of the weapon beneath the window.

The quality and quantity of the evidence of guilty knowledge in this case is more probative than in cases where this court has previously ruled that there was insufficient evidence of knowing possession to support a jury verdict beyond a reasonable doubt. For instance, in *Mergerson*, we reversed a defendant's conviction for being a felon in possession of a firearm which was discovered between the mattress and boxsprings of the bed he shared with his girlfriend. 4 F.3d at 348. A pawnshop receipt revealed that the handgun had been purchased by the defendant's girlfriend long before he moved into the residence. *Id.* The weapon was not in plain view. As there was "no . . . circumstantial indicia" of the defendant's knowledge of the weapon, we reversed. *Id.* at 349.

In *United States v. Onick*, we reversed the drug conviction of a houseguest of a drug dealer. 889 F.2d 1425 (5th Cir. 1989). As "[n]o evidence establishe[d] that she lived in the house[,]" we reasoned that dominion over the drugs therein should not be lightly imputed. *Id.* at 1429. The connection between the houseguest and the drugs, we concluded, was simply too attenuated to affirm the conviction.

In *Ortega Reyna*, we reversed a defendant's conviction of possession with intent to distribute illegal drugs, which were stuffed into the tire of a truck he borrowed. 148 F.3d 540. There, the circumstantial indicia of guilty knowledge relied upon by the Government were not directly related to the contraband; instead, the Government largely relied upon behavioral characteristics and factual circumstances generally associated with guilt, such as the defendant's lack of nervousness, lack of luggage, and possession of $700 in cash, which were easily explained for reasons other than his being a drug trafficker. *See id.* at 547 ("[W]hen circumstantial evidence and the reasonable inferences to be drawn

No. 10-41320

from it permit conclusions of both guilt and innocence that are essentially in balance, there has to be reasonable doubt.").

The present case is distinguishable from *Mergerson*, *Onick*, and *Ortega Reyna* in multiple respects. First, there is testimonial and photographic evidence that the firearm was located in reasonably plain view of Mudd's bed. Second, Mudd's inconsistent statements go directly to his knowledge of the location of the weapon. Such inconsistent statements are much more probative of guilt than inconsistent statements regarding tangential matters, such as where one was traveling or why one was traveling late at night. Lastly, as Mudd actually lived in his mother's home and had been living there for over two months, it is reasonable to infer, particularly after consideration of his inconsistent statements, that belongings in his bedroom belonged to or were accessible to him.

Under our deferential review of jury verdicts in cases where knowing possession of contraband is disputed, all that is required to sustain a jury verdict is evidence supporting at least a plausible inference that the defendant had knowledge of and access to the weapon or contraband. The facts outlined above, when taken together, create a plausible inference of Mudd's guilty knowledge. Accordingly, the defendant's conviction will be affirmed.

## III.

## A.

As Mudd had no opportunity at his sentencing to object to special conditions later included in his written judgment, "instead of reviewing for plain error, we review the . . . court's imposition of those conditions for an abuse of discretion[.]" *United States v. Bigelow*, 462 F.3d 378, 381 (5th Cir. 2006) (internal quotation marks omitted).

No. 10-41320

**B.**

"[I]f the written judgment conflicts with the sentence pronounced at sentencing, that pronouncement controls." *Id.* (emphasis omitted). "If, however, the difference between the two is only an ambiguity, we look to the sentencing court's intent to determine the sentence." *Id.* "The key determination is whether the discrepancy between the oral pronouncement and the written judgment is a conflict or merely an ambiguity that can be resolved by reviewing the rest of the record." *United States v. Mireles*, 471 F.3d 551, 558 (5th Cir. 2006). "If the written judgment broadens the restrictions or requirements of supervised release from an oral pronouncement, a conflict exists." *Id.*

At Mudd's sentencing, the district judge pronounced orally that he would "recommend drug and alcohol treatment instead of testing upon his release." However, the first special condition of supervision included in the written judgment provides that Mudd shall participate in a drug treatment program "which may include, but not be limited to urine, breath, saliva and skin testing" and shall "further submit to drug-detection techniques, in addition to those performed by the treatment agency, as directed by the probation officer."

As the district court stated at sentencing that Mudd would be afforded treatment in lieu of testing upon his release, the condition of supervision requiring him to submit to testing broadens the restrictions of the oral pronouncement. Accordingly, a conflict, rather than a mere ambiguity, exists, and the case must be remanded to the district court.

**IV.**

For the foregoing reasons, we **AFFIRM** Mudd's conviction, **VACATE** his sentence in part, and **REMAND** the matter to the district court with instructions to conform the written judgment to the oral pronouncement at sentencing.