**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

United States Court of Appeals
Fifth Circuit

**F I L E D**
April 24, 2013

Lyle W. Cayce
Clerk

No. 12-50242

UNITED STATES OF AMERICA,

Plaintiff - Appellee

v.

TERRENCE CHEMISE EWING,

Defendant - Appellant

Appeal from the United States District Court
for the Western District of Texas
USDC No. 6:11-CR-92-1

Before JONES, BARKSDALE, and SOUTHWICK, Circuit Judges.

PER CURIAM:[*]

Terrence Chemise Ewing, convicted for being a felon in unlawful possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2), presents one issue on appeal. He challenges a six-level sentence enhancement imposed pursuant to Guidelines §§ 2K2.1(b)(1)(A) (increase by two levels for possession of three to seven firearms) and 2K2.1(b)(4)(B) (increase by four levels if serial number on any firearm is altered or obliterated). AFFIRMED.

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 12-50242

## I.

On 16 February 2011, Waco, Texas, police department officers were dispatched to 1615 Harrison Avenue, in Waco, in response to a reported assault. Upon arrival, Ewing was seen running toward, and entering, a vehicle; after he drove around the corner, the officers stopped him. After Ewing exited the vehicle, he was placed in handcuffs and searched incident to his arrest.

At that time, another officer learned Ewing allegedly sexually assaulted a 15-year-old girl at Ewing's home, which was nearby at 1510 Harrison Avenue. Officers obtained a search warrant for that address. The search produced three firearms: two were discovered in the living-room closet, one with an obliterated serial number; one, in Ewing's bedroom. After officers learned Ewing had been convicted of a felony, he was arrested.

A 12 April 2011 indictment charged Ewing with being a felon in unlawful possession of:

> *at least one of the following firearms*, to-wit:
>> A Lorcin, .380 caliber semi-automatic handgun,
>> with unknown serial number;
>> A Terrior One, .32 caliber revolver . . . ;
>> A Smith & Wesson, . . . semi-automatic handgun
>> . . . ;
> which had moved in commerce and affecting commerce,
> in violation of [18 U.S.C. §§] 922(g)(1) and 924(a)(2).

(Emphasis added.) After a two-day trial in January 2012, a jury found Ewing guilty. The verdict did not require specifying which firearm Ewing unlawfully possessed.

Less than two months later, at the sentencing hearing presided over by the district judge who had presided at Ewing's trial, the court rejected Ewing's enhancement challenge, quoted *infra*, and adopted the pre-sentence investigation report (PSR), which recommended, *inter alia*: a two-level enhancement for officers' discovering three firearms in Ewing's possession,

2

No. 12-50242

pursuant to Guideline § 2K2.1(b)(1)(A); and a four-level enhancement for an obliterated serial number on one of the firearms in his possession, pursuant to Guideline § 2K2.1(b)(4)(B). As a result of the six-level enhancement's being applied, Ewing's offense level increased to 26; together with his criminal-history category of five, his advisory Guidelines sentencing range was 110 to 137 months' imprisonment (without the six-level enhancement, the range would have been 63 to 78 months). Because, pursuant to 18 U.S.C. § 924(a)(2), the maximum term of imprisonment was 120 months, the high-end of the range was changed to 120 months. Ewing was sentenced, *inter alia*, to 110 months' imprisonment.

## II.

As noted, for conviction, the jury was required only to attribute one of the three discovered firearms to Ewing. He acknowledges the Smith and Wesson pistol was found in his bedroom and contained his DNA; he does not contest the conviction. He challenges only the six-level enhancement.

Ewing's challenge to the enhancement arises out of its requiring the two firearms found in the living-room closet to be attributed to him. Consistent with his objection to the PSR, he asserts there was insufficient evidence to establish either his knowledge of those two firearms in the home, or an intent to exercise dominion and control over them.

Because Ewing preserved his sentence-enhancement challenge in district court, his sentence is reviewed for reasonableness under an abuse-of-discretion standard. *E.g.*, *Gall v. United States*, 552 U.S. 38, 50-51 (2007). The court's interpretation and application of the advisory Sentencing Guidelines is reviewed *de novo*; its factual findings, only for clear error. *E.g.*, *United States v. Cisneros-Gutierrez*, 517 F.3d 751, 764 (5th Cir. 2008); *United States v. Villegas*, 404 F.3d 355, 359 (5th Cir. 2005).

No. 12-50242

The enhancement ruling at issue is a finding of fact, reviewed only for clear error. *United States v. Rodriguez*, 630 F.3d 377, 380 (5th Cir. 2011). In that regard, "[a] district court cannot impose a sentence enhancement . . . unless the [G]overnment has proven any facts necessary to support the enhancement by a preponderance of the evidence". *Id.* The burden of proof to establish such a preponderance requires "evidence, which, as a whole, shows that the fact sought to be proved is more probable than not". 3 FED. JURY PRAC. & INSTR. § 104:01. Such evidence, "when considered and compared with the evidence opposed to it, has more convincing force, and produces [a] belief that what is sought to be proved is more likely true than not true". *Id.*

It goes without saying that the clear-error standard of review is deferential. *E.g.*, *Rodriguez*, 630 F.3d at 380. There is no clear error if the challenged findings are "plausible in [the] light of the record as a whole". *Cisneros-Gutierrez*, 517 F.3d at 764. Re-stated, a finding of fact is clearly erroneous "only if a review of all the evidence leaves us with the definite and firm conviction that a mistake has been committed". *Rodriguez*, 630 F.3d at 380 (internal quotation marks and citation omitted).

For sentencing, to properly calculate the number of firearms attributable to defendant, the court may include only firearms unlawfully possessed. U.S.S.G. § 2K2.1(b)(1) cmt. n.5. Where, as here, there was no actual possession of the firearms, the court must find constructive possession *vel non*, defined as "ownership, dominion, or control over the item itself, or control over the premises in which the item is concealed". *United States v. Houston*, 364 F.3d 243, 248 (5th Cir. 2004) (citing *United States v. Mergerson*, 4 F.3d 337, 349 (5th Cir. 1993)).

The searched residence was the home of Ewing's parents, which had belonged to Ewing's great-grandmother. Ewing was 12 when his family moved into the house in 1995; he moved out in 2000, around age 17, and returned approximately 10 years later, in November 2010, when he was 27 years of age.

No. 12-50242

In that vein, Ewing's joint occupancy of the residence cannot "by itself" establish constructive possession. *Houston*, 364 F.3d at 248.

In such instances, our court applies a "commonsense, fact-specific approach", *Mergerson*, 4 F.3d at 349 (internal quotation marks and citation omitted), to determine whether the evidence supports "a plausible inference that the defendant had knowledge of, and access to, the item[s]". *Houston*, 364 F.3d at 248 (citing *United States v. Hinojosa*, 349 F.3d 200, 204 (5th Cir. 2003)); *see Mergerson*, 4 F.3d at 348-49 (no plausible inference for constructive possession where weapon not in plain view and pawnshop receipt indicated co-defendant purchased weapon well before co-habitating with defendant). There need not be an affirmative link between defendant and the items. *Mergerson*, 4 F.3d at 349.

Because the two contested firearms were found in a bag underneath various items in the living-room closet, the facts arguably align with "hidden compartment" cases, in which the knowledge element can be satisfied only through "additional circumstantial evidence that is suspicious in nature or demonstrates guilty knowledge". *United States v. Mudd*, 685 F.3d 473, 477 (5th Cir. 2012) (internal quotation marks and citation omitted). Such circumstantial evidence includes inconsistent statements or implausible explanations, and is sufficient to establish knowledge. *Id.* at 478.

Prior to the sentencing hearing, Ewing filed the following objection to the six-level enhancement:

> Terrence Ewing objects to paragraph 23 of the [PSR] which adds 6 points (2 + 4) for the 2 firearms found in the front closet of the house. The basis for this objection is that (a) the house was owned and occupied by Emory & Sandra Ewing, not Terrence Ewing; (b) during the trial there was no evidence connecting Terrence Ewing to the two firearms in the front closet; (c) the only evidence presented at trial was that the 2 guns had been placed in the front closet by Terrence Ewing's great-grandmother and Terrence Ewing knew

5

nothing about the firearms; (d) there is no information in the offense report which would, in any way, connect Terrence Ewing to the firearms in the closet; and (e) the [PSR] fails to remind the court that Terrence Ewing only lived in the house for [sic] short time and that the guns found in the front closet where [sic] hidden from view.

The following related colloquy occurred at the sentencing hearing:

> The Court: [Defense counsel], what matters need to be ruled on this afternoon?
>
> [Defense counsel]: Your Honor, just one issue and that is whether or not the two guns that were found in the front closet of Terrence Ewing's parents' house should be attributed to Terrence Ewing. I think six points was [sic] added for that. Our argument is that mere presence alone is not enough to add that, that there was no affirmative evidence that showed that Mr. Ewing – Terrence Ewing knew of those weapons in the closet. In fact, the *only evidence presented* was that those guns had been placed in the closet years prior when Terrence Ewing was not living in the house and that he – that Terrence Ewing did not know about those weapons.
>
> The Court: *Wait. Wait. You said the only evidence. Where is that evidence found?*
>
> [Defense counsel]: *That evidence comes from the testimony of Emory Ewing* [defendant's father] *and – well, the witnesses – all the defense witnesses testified to that at the trial.*
>
> The Court: Okay.
>
> [Defense counsel]: And they're here in the courtroom if the Court needs them to testify again.
>
> I would also point out that had the government relied on those weapons in their closing argument, that might have been something, but they didn't. And since there was another gun and the only argument that the government made concerned the gun that had the DNA on it that was next to Terrence Ewing. Again, that's

> some indication that the guns in the closet had no connection whatsoever to Terrence Ewing. And so based on that, I mean, we understand that they're in the house that he's in and it's a common area, but at the same time without – if you don't have something more than mere presence, our argument is that's just not enough.

(Emphasis added.) Following additional argument by Ewing and the Government, the court ruled as follows: "The Court would find that the firearms are properly attributed to Mr. Ewing and overrule the objections" to the six-level enhancement recommended by the PSR.

"Generally, a PSR bears sufficient indicia of reliability to permit the sentencing court to rely on it at sentencing. The defendant bears the burden of demonstrating that the PSR is inaccurate; in the absence of rebuttal evidence, the sentencing court may properly rely on the PSR and adopt it." *United States v. Ollison*, 555 F.3d 152, 164 (5th Cir. 2009) (citation and internal quotation marks omitted). For the basis for the recommended six-level enhancement, the PSR stated: "Officers discovered in the living room closet two pistols", on one of which "[t]he serial number had been scratched off"; because "the instant offense involved three (3) to seven (7) firearms, add two (+2) levels", and because "defendant possessed a firearm with obliterated serial numbers, increase by four (+4) levels". As discussed, the only evidence relied upon to challenge the PSR's six-level-enhancement recommendation is the trial testimony of Ewing's father, mother, grandmother, and girlfriend.

Along that line, Ewing did not testify at trial. His mother, father, grandmother, and girlfriend testified on his behalf. Each of the three family members testified that Ewing had no knowledge of the firearms in the closet; the girlfriend testified only concerning the firearm found in Ewing's bedroom.

The testimony by the family members was consistent in each stating Ewing's great-grandmother placed the two firearms in the living-room closet;

but, the details in that regard are less certain. Ewing's father and grandmother were certain the firearms were placed in the closet in 2000; but, Ewing's mother testified it could have been anytime between 1996 and 2000. With respect to from whom the firearms were obtained, one testified it was Ewing's great-grandfather; one, Ewing's great-grandmother's "live-in friend"; and the other, Ewing's step great-grandfather. Ewing's grandmother and mother testified each firearm was obtained on a separate occasion, and each time placed in the closet; but, Ewing's father's testimony suggests both firearms were obtained and placed in the closet at the same time. Ewing's father and mother testified the firearms were obtained because Ewing's great-grandfather (or step great-grandfather, or his great-grandmother's "live-in friend", whichever is accurate), who brought the firearms to the house, was intoxicated, whereas Ewing's grandmother stated the events had nothing to do with alcohol. And each family member testified the other two family members were present, except Ewing's mother could not remember if Ewing's father was present. (The dissent takes issue with relying on the lack of credibility of witness testimony as evidence of defendant's guilt. *See* Dissent at 5. As noted, Ewing exercised his right not to testify at trial; he chose not to testify at sentencing as well, which, too, was his right. The testimony of his witnesses was, therefore, all the more important. At sentencing, the burden was on Ewing—not the Government—to establish the PSR was unreliable. *E.g.*, *Ollison*, 555 F.3d at 164. His relying only on the testimony of his witnesses to rebut the PSR left the district court with the requirement to examine their credibility in concluding whether the firearms in the closet should be attributed to Ewing.)

Other testimony from Ewing's family members called into question their credibility as well. (The dissent fails, for the most part, to address this portion of the defense witnesses' testimony, relying only on their testimony related to the firearms in the closet to conclude it does not incriminate Ewing. *See* Dissent

at 3-5. This narrow review ignores the requirement that evidence must be reviewed *as a whole* before a finding of fact can be overturned. *See, e.g.*, *Johnson v. Collins*, 964 F.2d 1527, 1532 (5th Cir. 1992) ("[A] review of all of the evidence" must leave our court with the "definite and firm conviction that a mistake has been committed" before findings of fact may be overruled.). This is an obvious matter the court could have relied upon in concluding the firearms in the closet were properly attributed to Ewing.) Ewing's mother and grandmother testified they did not approve of firearms, did not know anything about them, and did not want them in the house, yet, according to their testimony, they left these firearms in the home for over a decade. Even though Ewing's mother testified she was not comfortable around firearms, she allegedly took the Smith and Wesson (the firearm discovered in Ewing's bedroom) from a young man named Kenny in her front yard who was confronting another young man in a heated argument after Kenny pulled the firearm on the young man—a situation she considered "dangerous". She then took this loaded firearm, with a round in the chamber, and threw it in a clear bin containing clothes. The testimony by Ewing's parents was extremely detailed regarding the state of the bin: they noticed ashes and dust on the lid, indicating it had not been removed recently; the bin was so close to the wall the lid could not be lifted without moving the bin; and there were no indentations in the carpet indicating the bin had been moved. On the other hand, while Ewing's father testified on direct he forgot about the firearm in the bedroom, on cross he testified he asked someone to retrieve the weapon; Ewing's mother testified on cross she later tried to return the firearm in the bedroom. (The dissent concludes our reliance on this testimony to find implausibility is in error. *See* Dissent at 5-6 (stating the contradictions in the testimony "were on such minor points, and nothing was implausible", that an inference of guilty knowledge is not present). Again, at sentencing, the burden was on *Ewing* to establish the PSR's unreliability, *Ollison*, 555 F.3d at 164; and

9

his rebutting the PSR only with the testimony of his witnesses left the court to rely on that testimony as well.  As discussed, the Government was required to establish only by a preponderance of the evidence the enhancements were proper; and, our review is only for clear error.)

At trial, beyond Ewing's living in the home with his parents and his access to the common area where the two firearms were located, the Government did not present evidence suggesting Ewing had knowledge of the firearms in the living-room closet.  The Government focused its attention primarily on the firearm in the bin in Ewing's bedroom; for the two firearms in the living-room closet, the Government pursued discrediting Ewing's witnesses on cross-examination.

At sentencing, the Government asserted only that the evidence presented at trial showed the two firearms in the closet were in a common area of the home where Ewing resided, of which he would have access, dominion, and control, and those firearms were charged in the indictment that went to the jury.  As noted, neither party presented additional evidence at the sentencing hearing; as also noted, Ewing's family was present to testify if needed.  After hearing from each side, and finding the PSR "properly attributed" the firearms to Ewing and, therefore, denying his objection to the six-level enhancement recommended by the PSR, the court heard Ewing's denial of knowledge of all three firearms, including the one in his bedroom, when he accepted the court's invitation for allocution: "[H]ad I known the guns was [sic] in the house I would have got [sic] rid of them. . . . Or I would have had my mother and them get rid of them".

As discussed, the Government was required only to satisfy a preponderance-of-the-evidence standard for the enhancements to be imposed. Pursuant to our review of the record, and given the applicable deferential clear-error standard of review, *Rodriguez*, 630 F.3d at 380, and the "commonsense, fact-specific approach" on whether Ewing constructively possessed the two

firearms in the living-room closet, *Mergerson*, 4 F.3d at 349 (internal quotation marks and citation omitted), the district court did not clearly err in adopting the PSR's recommended six-level enhancement.  Re-stated, "a review of all the evidence [does not] leave[] us with the definite and firm conviction that a mistake has been committed".  *Rodriguez*, 630 F.3d at 380 (internal quotation marks and citation omitted).

There is no question Ewing had access to the two firearms because of their location in a common area of the home where he resided.  For the knowledge requirement, as Ewing was 17 years old at the time the firearms were supposedly placed in the closet, it is plausible he would have learned of their presence over the next ten years.  The only evidence presented to contest Ewing's knowledge was the testimony of his family members, which contained numerous inconsistencies.  The family members' testimony concerning their opinions of firearms, as compared to their treatment of the firearms in their home, calls into question their credibility as well.  Needless to say, the district judge, who presided at trial, had the opportunity to evaluate their credibility.

"When findings of fact are based on credibility determinations regarding witnesses, we must show even more deference to the trial court's findings." *Johnson*, 964 F.2d at 1532 (citing *Anderson v. City of Bessemer*, 470 U.S. 564, 574 (1985)).  And, Ewing's statements at the sentencing hearing asserting he "would have got [sic] rid of" the firearms had he known they were there is inconsistent with his DNA on the firearm in his bedroom, yet he did not "g[e]t rid of" that firearm.  Accordingly, it is "plausible in [the] light of the record as a whole" that Ewing was in constructive possession of the two firearms in the living-room closet, rendering the six-level-enhancement finding not clearly erroneous.  *Cisneros-Gutierrez*, 517 F.3d at 764.

## III.

For the foregoing reasons, the judgment is AFFIRMED.

No. 12-50242

Leslie H. Southwick, Circuit Judge, dissenting:

The majority correctly notes that we apply a clear-error standard of review to a district judge's fact-finding on sentencing enhancements. The standard "only requires a factual finding to be plausible in light of the record as a whole." *United States v. Rodriguez*, 630 F.3d 377, 380 (5th Cir. 2011). Still, "the government [must] prove[ ] any facts necessary to support the enhancement by a preponderance of the evidence." *Id.*

The government was required to prove that Ewing had constructive possession of the two firearms found in a closet accessed from the living room. Respectfully, I disagree with the majority that such evidence exists. I dissent.

Whether we analyze constructive possession in a joint occupancy context or in the hidden compartment context as the majority does, "something else (e.g., some circumstantial indicium of possession) is required besides mere joint occupancy [in a residence with a firearm] before constructive possession is established." *United States v. Mergerson*, 4 F.3d 337, 349 (5th Cir. 1993). We have required "additional 'circumstantial evidence that is suspicious in nature or demonstrates guilty knowledge.'" *United States v. Mudd*, 685 F.3d 473, 477 (5th Cir. 2012). The additional evidence must support "a plausible inference that the defendant had knowledge of, and access to, the item." *United States v. Houston*, 364 F.3d 243, 248 (5th Cir. 2004).

For the purposes of this appeal, I will assume this caselaw means that if there were evidence to support an inference that Ewing knew of the weapons and could have accessed them, that is enough. We are not requiring a reasonable inference that Ewing is the one who acquired the two weapons, or even that he ever touched them. Whose weapons they were, and whoever used or took possession of them, would not matter under that conception of the prohibition. Thus, the relatively undisputed facts are irrelevant that the residence was his parents; that it had previously been owned by Ewing's great-

grandmother; that Ewing resided there from 1995 to 2000, was imprisoned, then returned to live there from November 2010 until his arrest in February 2011; and that the weapons were acquired and placed in the closet by other family members during Ewing's initial time in the house.

Perhaps Ewing himself acquired those two handguns and was the one who put them in the bag in the closet, or regardless of their origins, perhaps Ewing at some time took the two weapons from the closet to examine or use. We are not requiring any of those actions, for which there is no evidence. Residing with knowledge and access are all that we require.

As the basis for recommending six-level enhancements, the Presentence Report ("PSR") stated: "Officers discovered in the living room closet two pistols," and then described the weapons. In the section computing the offense level, in which the "Specific Offense Characteristics" were described, the PSR stated: "Three (3) firearms were discovered in the defendant's possession."

It is evident from the PSR that two of the weapons were in Ewing's "possession" only if being found in a house in which he resided with other people was enough. Joint occupancy is not enough. *Mergerson*, 4 F.3d at 349. I do not interpret the majority to say that evidence that would be insufficient otherwise becomes sufficient merely by being stated in a PSR. Such an interpretation clashes with the principle that "*[g]enerally*, a PSR bears sufficient indicia of reliability to permit the sentencing court to rely on it at sentencing." *United States v. Ollison*, 555 F.3d 152, 164 (5th Cir. 2009). Elaborating on what that means, we also have held that a "district court may adopt facts contained in a PSR without inquiry, so long as the facts have an adequate evidentiary basis and the defendant does not present rebuttal evidence." *United States v. Caldwell*, 448 F.3d 287, 290 (5th Cir. 2006). There is no adequate evidentiary basis, even if assigning all three weapons to Ewing should even be considered a "fact" in this PSR, other than their being found in a house with a joint occupancy. Joint

occupancy is an insufficient fact. The government has the burden to prove a sentencing enhancement. *Rodriguez*, 630 F.3d at 380. It failed.

Perhaps, though, instead of being a fact-finding without an evidentiary basis, the PSR's assignment of all three firearms to Ewing should be considered a legal conclusion. If so, there is not a mirror proposition in the precedents that a PSR's legal conclusions as to the applicability of a sentencing enhancement are presumed reliable and must be rebutted by a defendant. A legal conclusion in a PSR, unsupported by factual findings with an evidentiary basis, does not shift this burden to a defendant.

The majority writes: "The only evidence presented to contest Ewing's knowledge was the testimony of his family members." I see the opposite problem. No evidence was introduced to show Ewing's knowledge, which makes the strength of contesting evidence unimportant. Although the standard of proof for sentencing enhancement is only a preponderance of the evidence, it is the government that bears this burden. *Id.* The government might have sustained this burden through DNA or fingerprint evidence, but tests for that kind of evidence failed. So too the government might have sustained this burden by showing that the firearms were in plain view. *See Mudd*, 685 F.3d at 479. The police officer who discovered the firearms testified that the firearms were found in a living room closet "pretty well full of items," and located in a camera bag that was itself "up underneath some stuff" including "a bunch of clothes, bunch of DVDs in a bag" with "stuff stacked all around it" such that a person "would not have easy access to it."

In 2011, when the two handguns were found, the closet was unlocked and Ewing could have accessed the weapons. Therefore, I agree Ewing had access. The issue that divides me from the majority is whether there is evidence Ewing knew of the handguns. The majority relies on circumstantial evidence that I

No. 12-50242

find insubstantial. Among the items of circumstantial evidence were supposedly doubtful explanations about the weapons by some of Ewing's family.

"Inconsistent statements and implausible explanations are among the behaviors previously recognized in this circuit as circumstantial evidence of guilty knowledge." *Mudd*, 685 F.3d at 478. To connect Ewing to those weapons, the majority identifies inconsistencies in the testimony of three other occupants of the residence. Ewing's father, mother, and grandmother testified at the guilt phase of his trial. These three witnesses agreed that a former resident of the house – Ewing's great-grandfather – was the one who initially possessed these firearms. The witnesses all agreed that Ewing's great-grandmother took the weapons from him and placed them in the living-room closet. One inconsistency noted by the majority is that the witnesses varied on what words they used to identify the initial owner's familial relationship. Ewing's father referred to the man as his "wife's grandpa," "the grandpa," and the grandmother's "husband." Ewing's mother referred to him as her "grandfather," before clarifying that he was her "step grandfather." Ewing's grandmother called him a live-in "friend." All I perceive from these different labels is that the proper relationship label for someone several generations removed, when more than one marriage may have been involved, may not have been clear to some in the family.

A second inconsistency was that Ewing's mother and grandmother said Ewing's great-grandmother took each of the two guns from the great-grandfather on separate occasions, while the majority interprets Ewing's father to have testified that both guns were taken at the same time. I do not interpret the father's testimony that way. The father was asked to "describe to the jury how those guns ended up in the closet." He replied:

> My wife's grandmother who we were living with, her --her husband, the grandpa -- my wife's grandpa used to go out and drink like every other weekend when he was off and they have these fields in our area that they used to go -- they have couches and chairs and stuff

15

where they all -- all their friends meet together and they drink. They had trees and stuff where they couldn't be seen and he would find them and bring them home. And my wife's grandmother took them away from him because he be drunk and she placed them in there in this bag and put them in there to get them away from him.

The father was asked to clarify: "So you were there at the time and saw her do that?" He responded: "Yes." He was asked whether Ewing was home "observing that." He responded: "No, sir. He wasn't." On cross examination, Ewing's father responded that he "happened to be present in the year 2000 when [his] wife's grandmother put them there" and that he "physically saw her do it." The father was unclear as to whether one or two seizures occurred.

A third supposed problem was that Ewing's father and mother testified that the great-grandmother took the guns from Ewing's great-grandfather when he was drunk. Ewing's grandmother testified alcohol was not a factor. This is the only direct inconsistency. It was certainly for the district court to determine what to make of that difference – a telling inconsistency or different perceptions or knowledge or willingness to acknowledge an uncomfortable detail.

Finally, there was not complete agreement about the year that the weapons were placed in the closet. Ewing's father testified that the guns were placed in the closet "around 2000"; Ewing's grandmother testified "around 2000" and in "2000." Ewing's mother first stated: "I can't remember the exact dates." Asked again whether she could remember the year, she testified: "It would have been like in '97, '96. It was in 2000 -- I think it was in 2000. I'm not for sure." To the extent there are clear differences in dates, and I am not sure there are, no one was seeking to protect Ewing by saying the weapons were taken at a time when he was incarcerated and not living in the home.

I see in these allegedly condemning inconsistencies nothing more than the usual minor differences in testimony about events. The general thrust of everyone's story was the same, and the stories are plausible. True, the district

court makes credibility determinations and draws reasonable inferences, but I do not find it reasonable to conclude that someone who testifies in 2012 about events in about 2000 must be precise about these minor matters in order to keep that testimony from being incriminating.

Even if these possible discrepancies could reasonably be considered by a district judge as serious in some respects, the potential dissembling of witnesses other than the accused about actions of individuals other than the accused should not matter. When this court has recognized suspicious behaviors as evidence of guilty knowledge, we have usually done so when the *defendant* so behaves, typically at the scene and time of discovery of contraband. *See, e.g.*, *United States v. Mendoza*, 522 F.3d 482, 489-90 (5th Cir. 2008) (defendant's statements to border patrol agents); *United States v. Villarreal*, 324 F.3d 319, 325 (5th Cir. 2003) (defendant's statements to police at the time of arrest and in a post-arrest interview); *United States v. Cano-Guel*, 167 F.3d 900, 905 (5th Cir. 1999) (defendant's statements to customs officials).

The criminal activity in which we often consider these behaviors is drug possession. After an officer finds drugs hidden in a defendant's vehicle, these behaviors are relevant in determining whether the defendant knew of the drugs or rather was the unwitting conduit of a third party. *See United States v. Resio-Trejo*, 45 F.3d 907, 911 (5th Cir. 1995). The majority arguably extends this line of cases by holding that the guilty knowledge of a defendant can be evidenced solely by third-party statements, made during trial testimony, that are at the very least internally consistent.

To the extent that the holding rests on implausibility, this court further permits witnesses' lack of credibility on one subject – why and when firearms were stored by someone else – to be evidence the defendant knew the guns were in the closet. I recognize the logical inference here, namely, that these family members concocted tales to protect Ewing, but their stories did not quite hold

together. The contradictions, though, were on such minor points, and nothing was implausible, that I find no support for any relevant inference.

Any possible inconsistencies in the testimony of other witnesses have no bearing on knowledge Ewing would have had about the guns. The testimony given by Ewing's father, mother, and grandmother is consistent that the guns came from Ewing's great-grandfather (though the relationship label varied), and were placed in the closet by Ewing's great-grandmother in 2000 without Ewing's contemporary or later knowledge. The family members arguably became more implausible when they testified that even though one or more of them disapproved of firearms, these two weapons remained in the closet for years.

There is one statement made by Ewing that the majority discusses. At the sentencing hearing, he said that "had I known the guns was in the house I would have got rid of them." The majority views this as not credible because Ewing's DNA was found on the firearm in the bedroom, possession of which Ewing does not challenge on appeal. He clearly did not get rid of that one. Ewing made this statement after the district court had determined that he was responsible for all the firearms. Therefore, the district court could not have relied on this statement to support the attribution of the two contested firearms. Further, the statement followed an exchange among both attorneys and the court about the two disputed firearms, not the one found in a bin beside Ewing's bed. Ewing's statement that he would have gotten rid of any firearms he knew about is implausible in light of the weapon he kept in his bedroom. Ewing did protest too much, but I see this implausibility as having little to do with whether he actually knew about the two firearms in the living-room closet.

Not only did the district court not consider this one statement by Ewing before making the sentencing decision, the court did not refer to the credibility of Ewing's family members or the inconsistency or implausibility of their statements. The district court simply ruled that the PSR "properly attributed"

18

the firearms to Ewing.  The views of inconsistency and implausibility originate with this court's assessment of what is "plausible in light of the record as a whole."  *United States v. Cisneros-Gutierrez*, 517 F.3d 751, 764 (5th Cir. 2008).  Although it may be logical to speculate that the family members concocted tales to hide Ewing's knowledge, I find no support for deriving this inference given that the contradictions were on such minor points and the stories were plausible.

The question, again, is whether these statements amount to evidence demonstrating that Ewing had guilty knowledge of the firearms.  *Mudd*, 685 F.3d at 477.  We have held that certain circumstantial evidence did not permit the "reasonable inference of guilty knowledge" when the "evidence invited only speculation and conjecture."  *United States v. Beckner*, 134 F.3d 714, 719 (5th Cir. 1998).  We have found plain error in applying a sentencing enhancement when the government speculated, but did not provide evidence, that the defendant's false statements caused a bank to issue a loan.  *United States v. Sandlin*, 589 F.3d 749, 757 (5th Cir. 2009).

The testimony of Ewing's family members was consistent that Ewing did not observe the two firearms being hidden and Ewing did not subsequently learn of the firearms' existence.  As my review of the majority's reasoning has attempted to show, there is no evidence to create a plausible or reasonable inference – as opposed to speculation or conjecture – that Ewing had guilty knowledge of the existence of the two firearms.  There must be "some evidence supporting at least a plausible inference that the defendant had knowledge."  *Mudd*, 685 F.3d at 477.  In the absence of this evidence, I would hold that the two sentencing enhancements based on the two firearms in the living-room closet are unsupported by any evidence.  Therefore, I would vacate and remand to the district court for re-sentencing.