# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**
April 14, 2010

Lyle W. Cayce
Clerk

No. 09-50298

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

TIOFILA SANTILLANA,

Defendant-Appellant.

Appeal from the United States District Court
for the Western District of Texas

Before GARWOOD, SMITH, and CLEMENT, Circuit Judges.

JERRY E. SMITH, Circuit Judge.

Tiofila Santillana was convicted by a jury of distributing methadone resulting in the death of Brandon Moore. She argues that there is insufficient evidence to convict. We affirm.

No. 09-50298

I.

The facts are not disputed. On April 9, 2008, Moore obtained an unknown quantity of Xanax[1] pills from a friend, Emily Suckarieh. Later that evening, Moore and a friend, Tyler Dickson, went to Santillana's home. Dickson bought about fourteen methadone pills from Santillana, then left. Moore stayed a few minutes longer, then briefly rejoined Dickson outside. Though she could not remember the precise date, Santillana later admitted that she also sold methadone tablets to Moore at her house on or around April 9.

At about 10:30 p.m., Moore left the home of a friend, Dona Shaw, where he had taken up temporary residence. Moore returned around 3:30 a.m. Shaw testified that when he came in, Moore looked "a little more hyped up" than he usually did. At approximately 5:30 a.m., Moore went to sleep on Shaw's sofa and continued to sleep there throughout the day. At 6 p.m., Shaw tried to rouse Moore, who was largely unresponsive. Shaw called another of Moore's friends to help shake Moore awake. When neither of them could do so, they called Suckarieh, who decided to take Moore to the hospital at about 7 p.m.

Moore was admitted to the emergency room. A urine screen tested positive for at least four different drugs: cocaine, amphetamine, benzodiazepines (i.e., Xanax), and methadone; he also tested positive for opiates, though that result could have been caused by the methadone.[2] He had a small amount of alcohol in his system.[3] Steven Rea, the attending physician, put Moore on a ventilator

---

[1] Xanax is a prescription drug used to treat anxiety disorders.

[2] Dr. Stacey Hail, a government expert, testified that opiates are naturally-occurring compounds derived from the poppy plant, including morphine, codeine, and heroin. Methadone is a member of a class of synthetic compounds known as opioids. Synthetic opioids mimic the chemical behavior of natural opiates. As a result, an opioid such as methadone can sometimes—but not always—cause a false positive test for opiates.

[3] Dr. William Rohr, an expert witness for Santillana, testified that the hospital report showed Moore's alcohol level at 10 milligrams per deciliter, which he estimated was equiva-
(continued...)

2

No. 09-50298

and administered Narcan, a reversal agent for narcotics. Moore responded briefly to the Narcan but then had to be sedated to prevent him from pulling out his breathing tube. Moore spent the next eleven days in intensive care and another two days in hospice care. He died on April 23.

After an investigation by the Drug Enforcement Administration ("DEA"), Santillana was charged with distributing a schedule II controlled substance (methadone) to Moore, resulting in his death, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C). The jury heard testimony from three medical experts.

Dr. Nizam Peerwani performed Moore's autopsy and testified that Moore died from brain death resulting from acute mixed drug intoxication. Peerwani concluded that methadone was probably the cause of death, because it was the only positively identified drug in Moore's body that would have restricted breathing and thus reduced oxygen to the brain. On cross-examination, however, Peerwani conceded that if another unidentified opiate were present in Moore's body, it could have also contributed to depressed respiration and brain death. He declined to identify one particular drug as the exclusive cause of death.

Stacey Hail, an emergency medical physician and toxicologist, was a government witness. Based on her review of Moore's medical records, she concluded that death was caused by a "poison cocktail" of methadone and Xanax. She testified that methadone is a highly lethal drug and that, when paired with Xanax (which is not very lethal by itself), methadone becomes even more lethal.[4] She also stated that Moore's presentation in the emergency room––pinpoint pupils and long-lasting depression of the central nervous system and respiration––was

---

[3] (...continued)
lent to one-half of one drink. Rohr estimated that Moore's alcohol level had been substantially higher during the night and early morning of April 9-10.

[4] According to Hail, some speculate that Xanax may slow down the body's metabolism of methadone, giving methadone a longer-lasting effect.

consistent with lethal methadone use.

Hail discounted the possibility that one of the other drugs in Moore's system caused his death. She testified that Xanax by itself would not have lowered respiration and thus reduced oxygen to the brain. Likewise, cocaine and amphetamine, as stimulants, would not have had the depressive effect Moore exhibited. An opiate such as heroin was unlikely to have caused Moore's death, Hail reasoned, because heroin, unlike methadone, has a short-lasting effect; the drug affecting Moore was long-lasting. Finally, another opioid such as hydrocodone would have been accompanied by a positive test for Tylenol, for which Moore tested negative. Though she thus concluded that a combination of methadone and Xanax killed Moore, Hail also testified that methadone alone could have been the cause of death.[5]

William Rohr, a county medical examiner, testified that he agreed with Peerwani's conclusion that Moore died from mixed drug intoxication. Although he acknowledged that methadone played a role in Moore's death, he did not believe it was possible to identify a single drug as the cause. Rohr explained that the urine screen identifying the drugs in Moore's body did not indicate the quantities of any of the drugs. Moreover, Rohr testified that in his training as a medical examiner, he had learned that when there are several drugs in a per-

---

[5] Hail's testimony included the following exchange:

Q: "Let's assume there was no Xanax in this case. For whatever reason, Mr. Moore didn't take any benzodiazepine. Is this the kind of situation where you could opine that methadone alone might have resulted in Mr. Moore's death?

A: Absolutely.

Q: And why do you say that?

A: Because methadone, again, is a very potent, long-acting drug. And even in the smallest, normal therapeutic dose, it can cause respiratory depression and death."

No. 09-50298

son's system at the time of death, he could not "pick and choose" which one caused the death, because "you don't know exactly how all of these [drugs] interplay." Rather, his practice was to "list all the drugs involved and leave it at that."

At the close of testimony, the jury deliberated for approximately forty minutes. It returned a verdict of guilty.

II.

Santillana raises two arguments on appeal, both regarding the sufficiency of the evidence. First, she alleges there was insufficient evidence to establish that the methadone in Moore's body at the time of his death was the same methadone Santillana sold to him. Santillana also claims there was insufficient evidence to show that Moore's death "result[ed]" from methadone according to § 841(b)(1)(C).

When reviewing sufficiency of the evidence, we will affirm if a reasonable trier of fact could have concluded that the evidence established the essential elements of the offense beyond a reasonable doubt. *United States v. Lopez*, 74 F.3d 575, 577 (5th Cir. 1996). We consider all evidence, credibility determinations, and reasonable inferences drawn therefrom in the light most favorable to the prosecution. *Id.* The jury may choose among reasonable constructions of the evidence: The evidence need not exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt. *Id.* We will reverse, however, if after viewing the evidence in the light most favorable to the prosecution, the evidence still gives equal or nearly equal support to a theory of guilt and a theory of innocence, *id.*, because in that event, a reasonable trier of fact must necessarily entertain reasonable doubt, *United States v. Sanchez*, 961 F.2d 1169, 1173 (5th Cir. 1992).

No. 09-50298

A.

The statute under which Santillana was convicted imposes a minimum sentence on defendants who distribute a schedule I or II drug when the subsequent use of that drug causes death or serious injury.  Under 21 U.S.C. § 841-(a)(1) and (b)(1)(C), it is

> unlawful for any person knowingly or intentionally . . . to . . . distribute . . . a controlled substance[.]
> . . . .
> In the case of a controlled substance in schedule . . . II [such as methadone] . . . if death or serious bodily injury results from the use of such substance [an offender] shall be sentenced to a term of imprisonment of not less than twenty years or more than life, a fine not to exceed the greater of that authorized in accordance with the provisions of Title 18, or $1,000,000 if the defendant is an individual or $5,000,000 if the defendant is other than an individual, or both.

It is thus an essential element of the conviction that Moore died as a result of the specific methadone distributed by Santillana.

Santillana argues that there was insufficient evidence to link the methadone she admits selling to Moore to the methadone present in his body at the time of his admission to the hospital.  Santillana points to evidence that Moore was a heavy drug user who had multiple drugs in his system when he arrived at the emergency room and to the lack of testimony that Moore ever ingested the particular methadone tablets he received from Santillana.  She therefore reasons that there was equal evidence that Moore obtained his fatal dose of methadone from another supplier.

Santillana's reasoning is unpersuasive.  Although the evidence did not provide an airtight chain-of-custody account of the methadone tablets Santillana sold to Moore, there was ample support for a reasonable jury to infer that Moore ingested those tablets before slipping into his fatal coma.  Santillana admitted selling methadone to Moore just hours before he passed out.  A DEA agent testi-

fied that approximately an hour-and-a-half after Moore and Dickson purchased methadone from Santillana, at the outset of his night of partying, Moore sent Dickson a text message asking for advice on taking methadone. The jury also learned that Santillana was a regular methadone supplier for a number of people in Moore's circle of friends.

Santillana does not point to any evidence that Moore received methadone, as opposed to the other drugs in his system, from another source. As noted above, the evidence need not foreclose every possible theory of innocence; the jury is free to choose among reasonable constructions of the evidence. Viewed in the light most favorable to the verdict, the evidence does not lend equal or nearly equal support to the theories that Moore ingested methadone from another source and that he ingested the methadone Santillana sold to him. The jury could have reasonably concluded that the methadone Moore ingested the night before he was admitted to the hospital was the same methadone he purchased from Santillana.

## B.

Santillana contends there was insufficient evidence for the jury to conclude that Moore's death "result[ed]" from the methadone in his system, within the meaning of § 841(b)(1)(C). Santillana concedes that all three medical witnesses, including her own expert, Rohr, concluded that methadone was at least a contributing cause of death. She argues, however, that the plain meaning of "results" implies "a stronger degree of causation than mere contribution." Santillana does not explain what this "stronger degree of causation" might be. She does not argue, for instance, that a drug must be the *exclusive* cause of death to create culpability under § 841(b)(1)(C). Nor does she contend that the common-law understanding of proximate cause should be the standard.

Even if Santillana is correct that "results" implies a "stronger degree of

causation than [does] mere contribution," we still will not disturb the verdict. The jury heard evidence from Hail, the only expert witness certified in toxicology, that methadone was more than a mere contributing cause to Moore's death; in Hail's opinion, methadone was the determinative cause of death, either in combination with Xanax or by its own effect. The jury was free to weigh the relative persuasiveness of Hail's testimony against that of Peerwani and Rohr, neither of whom gave a detailed explanation of his disagreement with Hail's reasoning. Thus, there was sufficient evidence for a reasonable jury to conclude that Moore's death resulted from his use of methadone under a heightened standard of causation.

AFFIRMED.