# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

October 3, 2017

Lyle W. Cayce
Clerk

No. 16-10386

UNITED STATES OF AMERICA,

Plaintiff – Appellee,

v.

ELECHI N. OTI; THEODORE E. OKECHUKU; KELVIN L. RUTLEDGE;
EMMANUEL C. IWUOHA,

Defendants – Appellants.

Appeals from the United States District Court
for the Northern District of Texas

Before JOLLY, ELROD, Circuit Judges, and STARRETT, District Judge.[*]

JENNIFER WALKER ELROD, Circuit Judge:

After a two-week jury trial, Defendant-Appellants Theodore Okechuku, Elechi Oti, Emmanuel Iwuoha, and Kevin Rutledge were convicted of conspiring to unlawfully distribute hydrocodone outside the scope of professional practice and without a legitimate medical purpose as part of an alleged pill mill. Okechuku was also convicted of two additional firearm counts—using, carrying, and brandishing a firearm during and in relation to a drug-trafficking crime and conspiring to do the same. Appellants challenge the

---

[*] The Honorable Keith Starrett, of the United States District Court for the Southern District of Mississippi, sitting by designation.

No. 16-10386

sufficiency of the evidence of their convictions as well as allege that the district court committed various errors at trial and at sentencing. Because the evidence was sufficient to support Appellants' convictions and because we conclude that the errors Appellants allege either were not errors or they were harmless, we AFFIRM.

## I. Background

Defendant-Appellant Theodore Okechuku is a medical doctor who owned and operated a pain-management clinic called the Medical Rehabilitation Center in Dallas, Texas.[1] Okechuku worked at the clinic one to two days a week, also working full-time as a pediatric anesthesiologist at the University of Mississippi. Okechuku operated the clinic with the assistance of Ignatius Ezenagu, who worked as office manager at the clinic. The clinic was a cash-only business, and it did not accept insurance, Medicaid, or Medicare, nor did it take appointments. When the clinic opened in the mornings, it usually had thirty to forty patients waiting to enter. On average, the clinic had $5,000 in revenue a day and as much as $11,000 per day.

In addition to Okechuku, two of the other defendant-appellants worked at the clinic. Elechi Oti was a licensed physician's assistant who saw patients and wrote prescriptions at the clinic three days a week. Emmanuel Iwuoha, who did not have a medical license in the United States, saw patients and wrote prescriptions that were pre-signed by Okechuku. Okechuku paid Oti and Iwuoha per patient, and the patient visits typically lasted only four to eight minutes and involved little-to-no physical examination. Their medical notes

---

[1] We present the facts in the light most favorable to the conviction, as we must. *See United States v. Thomas*, 690 F.3d 358, 366 (5th Cir. 2012).

No. 16-10386

were consistently sparse, and they wrote almost every patient a prescription for hydrocodone.[2]

A man named Jerry Reed frequently brought people to the clinic. David Reed, Jerry's brother, and Defendant-Appellant Kevin Rutledge also brought people to the clinic. Jerry Reed, David Reed, Rutledge, and their cohorts recruited "patients"—often from homeless shelters—and drove them to the clinic and paid for their patient examination. After the patients received their prescriptions from the clinic, these men would pay to fill the prescriptions and keep the medication to be resold later. The men payed the patients as much as $50 each for their services.

Okechuku implemented various security measures at the clinic. A large amount of cash was generated at the clinic every day. Okechuku put up bars around the room where clinic employees collected cash, hired armed security guards, and installed surveillance cameras that allowed him to observe remotely what was happening at the clinic from his cell phone. He also required clinic employees to fax him the clinic's cash earnings each day.

In April 2013, Okechuku fired Ezenagu. Several days after Okechuku fired Ezenagu, the FBI executed a search warrant at the clinic, suspecting that the clinic was being used as a "pill mill"—a drug business exchanging controlled substances for cash under the guise of a doctor's office. Agents seized

---

[2] Hydrocodone is an opioid painkiller.  Mayo Clinic, *Mayo Clinic Q and A: Opioids for treatment of pain—benefits and risks*, https://newsnetwork.mayoclinic.org/discussion/mayo-clinic-q-and-a-opioids-for-treatment-of-pain-benefits-and-risks/ (last visited September 1, 2017).  Opioids account for more fatal overdoses each year than cocaine and heroin combined.  *Id.*  In 2015 alone, there were over 22,000 fatal overdoses on prescription opioid painkillers—more than twice the number in 2005 and more than five times the number in 2000.  NIH, *National Overdose Deaths from Select Prescription and Illicit Drugs*, https://www.drugabuse.gov/sites/default/files/overdose_data_1999-2015.xls (last visited September 1, 2017).

3

patient files, business records, pre-written prescriptions, and seventy-seven days of surveillance camera footage.

In 2014, Okechuku, Oti, Iwuoha, Rutledge, David Reed, Jerry Reed, and Ezenagu were all charged in a superseding indictment with conspiring to unlawfully distribute a controlled substance, in violation of 21 U.S.C. §§ 846, 841(a)(1) & (b)(1)(E)(i) (Count One); using, carrying, and brandishing a firearm during and in relation to, and possessing and brandishing a firearm in furtherance of, a drug-trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A)(ii) (Count Two), and conspiring to do the same in violation of 18 U.S.C. § 924(o) (Count Three). The government later filed a motion to dismiss Count Three as to everyone except for Ezenagu and Okechuku. In October 2015, Okechuku, Iwuoha, Oti, and Rutledge proceeded to trial together.

At trial, the defense's theory was that Ezenagu used the clinic without Okechuku's knowledge and made an unlawful agreement with Jerry Reed to bring illegitimate patients into the clinic. Defense counsel contended that these fake patients duped Okechuku, Oti, and Iwuoha into prescribing them controlled substances that were not medically necessary. Defense counsel also asserted that Okechuku and his employees ran a legitimate medical clinic and conscientiously tried to screen for illegitimate patients. Okechuku testified at trial in his own defense.

The government's theory of the case was that the defendants operated the clinic as a "pill mill". In support of this theory, the government presented five full days of evidence, including eighteen witnesses as well as video and photographic evidence of the events that transpired at the clinic. After a two-week trial, the jury found Okechuku, Oti, Iwuoha, and Rutledge guilty of Count One—conspiring to unlawfully distribute hydrocodone outside the scope of professional practice and without a legitimate medical purpose. The jury also

No. 16-10386

found Okechuku guilty of Counts Two and Three—using, carrying, and brandishing a firearm during and in relation to a drug-trafficking crime and conspiring to do the same.

The district court sentenced Okechuku to 300 months in prison, Oti to 97 months, Iwuoha to 97 months, and Rutledge to 120 months. All four of these defendants now appeal their convictions on various grounds.

## II. Sufficiency of the Evidence

Okechuku, Iwuoha, and Oti challenge the sufficiency of the evidence for their convictions. Because Okechuku and Iwuoha preserved the issue by moving for acquittal under Federal Rule of Criminal Procedure 29 at the close of the government's case-in-chief and again post-verdict, we will review their challenges *de novo*. *See United States v. Girod*, 646 F.3d 304, 313 (5th Cir. 2011). Our *de novo* review of a challenge to the sufficiency of the evidence is "highly deferential to the verdict." *United States v. Cannon*, 750 F.3d 492, 506 (5th Cir. 2014). We consider the evidence in the light most favorable to the government, with all reasonable inferences and credibility determinations made in the government's favor. *United States v. Santillana*, 604 F.3d 192, 195 (5th Cir. 2010). "[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). Our inquiry is limited to whether the jury's verdict was reasonable, not whether we believe it to be correct. *See United States v. Moreno-Gonzalez*, 662 F.3d 369, 372 (5th Cir. 2011).

Because Oti failed to renew her motion for judgment of acquittal after the jury's verdict, we review her sufficiency challenge for plain error. *See United States v. McIntosh*, 280 F.3d 479, 483 (5th Cir. 2002). In the sufficiency of the evidence context, this court has stated that it will reverse under plain

error review only if there is a "manifest miscarriage of justice," which occurs only where "the record is devoid of evidence pointing to guilt" or the evidence is so tenuous that a conviction is "shocking." *United States v. Delgado*, 672 F.3d 320, 331 (5th Cir. 2012).

## A. Count One

Okechuku, Iwuoha, and Oti each challenge the sufficiency of the evidence supporting their conviction of conspiring to unlawfully distribute hydrocodone outside the scope of a professional practice. The elements of conspiracy to distribute and dispense a controlled substances outside the scope of professional practice are: (1) an agreement by two or more persons to unlawfully distribute or dispense a controlled substance outside the scope of professional practice and without a legitimate medical purpose;[3] (2) the defendant's knowledge of the unlawful purpose of the agreement; and (3) the defendant's willful participation in the agreement. *See United States v. Simpson*, 741 F.3d 539, 547 (5th Cir. 2014) (citing 18 U.S.C. § 1349); *see also* 21 U.S.C. §§ 846, 841(a)(1). An agreement may be inferred from concert of action, knowledge may be inferred from surrounding circumstances, and voluntary participation may be inferred from a collection of circumstances. *See United States v. Grant*, 683 F.3d 639, 643 (5th Cir. 2012). We conclude that the evidence presented at trial is sufficient to support each element of this offense as to Okechuku, Iwuoha, and Oti.[4]

---

[3] Because Okechuku, Iwuoha, and Oti are all medical professionals and generally authorized to prescribe controlled substances, the government also had to prove beyond a reasonable doubt that the distribution was other than in the course of professional practice and for a legitimate medical purpose. *See United States v. Brown*, 553 F.3d 768, 781 (5th Cir. 2008).

[4] Okechuku, Iwuoha, and Oti do not challenge the existence of an agreement between Ezenagu and Jerry Reed to violate narcotics laws. They only challenge the sufficiency of the

No. 16-10386

As to Okechuku, the evidence presented by the government at trial demonstrated that he was the owner of the clinic, and that he kept close tabs on the clinic.[5] Okechuku was physically present at the clinic two to three days a week, and he himself testified that he would have known what was occurring at the clinic. The government offered testimony that Okechuku met several times alone with Jerry Reed and Ezenagu in his office, as well as Ezenagu's testimony that "Okechuku knew from day one" that Jerry Reed was bringing illegitimate patients to the clinic. The government offered video evidence showing Jerry Reed freely roaming the halls of the clinic and talking to Ezenagu just outside Okechuku's office while Okechuku was present. One clinic receptionist testified that drug dealers were at the clinic when Okechuku was present at the clinic, and another receptionist testified that she saw Okechuku meet with Jerry Reed and Ezenagu a couple of times in his office. Other video evidence showed Jerry Reed, Ezenagu, and Okechuku meeting at the clinic while the clinic was closed. Within an eight-hour work day, the clinic would see forty to fifty patients, a number of patients that the government's expert, Dr. Graves Owen, testified would have been "impossible" for a provider practicing within the normal scope of professional practice. Okechuku was well-aware that his clinic was seeing this many patients in such a short

---

evidence showing that they had knowledge of the agreement and that they willfully participated in the conspiracy.

[5] The evidence showed that when Okechuku was away from the clinic, he kept remarkably close tabs on its operations. Specifically, Okechuku installed several cameras at the clinic that allowed him to monitor a live video feed of the clinic's operations from his cell phone. Clinic employees testified that they knew Okechuku monitored the cameras because he often called the clinic when he was away to complain that there were too many people congregating in the hallway or that patients needed to be controlled outside. Okechuku himself testified that he "spot check[ed] the cameras each day. The government provided evidence that those same cameras showed Jerry Reed and others coming to the clinic, signing in patients, handling patient files, giving cash to patients, and moving freely around the clinic.

amount of time, as the evidence demonstrated that he required his staff to fax him the clinic's earnings and the number of patients the clinic saw each day. This evidence, when viewed in the light most favorable to the conviction, is enough to support Okechuku's conviction under Count One.[6] *See Santillana*, 604 F.3d at 195.

The evidence at trial was also sufficient to support Iwuoha's conviction that he knew of and willfully participated in a pill mill scheme. The government presented testimony that even though Iwuoha was not licensed to write prescriptions, he wrote prescriptions at the clinic that were pre-signed by Okechuku. The government also presented testimony that Iwuoha held himself out to be a doctor even though he was not licensed to practice medicine in Texas. Despite the fact that he was not licensed to practice medicine, the clinic paid Iwuoha more than eight times the amount he was paid at his other job as an anesthesiologist technician. Several witnesses testified that many of the clinic's patients were obviously homeless and could not afford a $150 or $190 doctor visit or the prescriptions Iwuoha and the other providers wrote. Video footage and witness testimony presented at trial established that Iwuoha's patient visits usually lasted less than eight minutes, often lasting less than four minutes. Moreover, Iwuoha's patient notes were consistently sparse. Of the 87 patients that Iwuoha saw in a two-day sample period, all 87 of them were prescribed hydrocodone. Ezenagu testified that he saw Jerry Reed go into Iwuoha's office, and that based on Ezenagu's experience at the clinic, he believed Iwuoha knew what Jerry Reed and the other drug dealers

---

[6] Okechuku lists various pieces of evidence that he claims "the jury could have relied to counter the government's evidence." However, "[t]he evidence need not exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilty, and the jury is free to choose among reasonable constructions of the evidence." *United States v. Salazar*, 66 F.3d 363, 370 (5th Cir. 1995).

were doing.[7] This evidence of short visits, sparse patient notes, lack of individualized treatment, and higher pay, combined with all of the other evidence presented at trial was sufficient to support the jury's verdict that Iwuoha was aware of and voluntarily joined in the pill mill activities occurring at the clinic. *See Santillana*, 604 F.3d at 195.

We likewise conclude that the evidence at trial was sufficient to support Oti's conviction. The government presented evidence at trial that Oti kept pages of prescriptions already filled out by her for the highest strength of hydrocodone. She also frequently issued non-refillable prescriptions. The government also presented testimony from an undercover agent who was treated by Oti and testified that Oti watched television during the entire examination and never touched her. Video evidence presented at trial also showed the consistently short duration of Oti's patient visits, and documentary evidence showed the sparseness of her medical notes. There was also evidence that Oti was familiar with Jerry Reed and knew what he was doing, including video evidence of her meeting with Jerry Reed in her office and phone records showing at least three contacts between them. Further, Ezenagu testified that, based on his time and experience at the clinic, he believed Oti knew what Jerry Reed, Rutledge, and David Reed were doing at the clinic. Finally, the government presented evidence indicating that Oti had worked for a pill mill in the past and was therefore familiar with how they operated. Far from being

---

[7] Iwuoha argues that the government's evidence against him consisted mainly of Ezenagu's unsupported testimony that he "believe[d] that Emmanuel Iwuoha and Elechi Oti were aware of what Jerry Reed [and his cohorts] were doing." However, Ezenagu's belief was based on his experience working at the clinic six days per week and seeing Jerry Reed go into Iwuoha's and Oti's office on multiple occasions. Further, we accept all credibility determinations made by the jury which tend to support the verdict. *See United States v. Asibor*, 109 F.3d 1023, 1030 (5th Cir. 1997).

No. 16-10386

devoid of evidence, the trial record has ample evidence showing that Oti knowingly and voluntarily joined in a conspiracy to operate the clinic as a pill mill. *See Delgado*, 672 F.3d at 331.

## B. Counts Two and Three

Okechuku also challenges the sufficiency of the evidence supporting his conviction under the firearm counts. Okechuku was convicted of using, carrying, and brandishing a firearm during and in relation to a drug-trafficking offense in violation of 18 U.S.C. § 924(c)(1)(A)(ii). Section 924(c)(1) "requires the prosecution to make two showings. First, the prosecution must demonstrate that the defendant 'use[d] or carrie[d] a firearm.' Second, it must prove that the use or carrying was 'during and in relation to' a 'crime of violence or drug trafficking crime.'"[8] *Smith v. United States*, 508 U.S. 223, 227–28 (1993). The jury also found that the firearm was "brandished," subjecting Okechuku to enhanced penalties under 18 U.S.C. § 924(c)(1)(A)(ii). Okechuku was also convicted of conspiring to violate section 924(c), in violation of 18 U.S.C. § 924(o).

Okechuku challenges both of his firearm convictions on the same basis, arguing that there was insufficient evidence to support the "in relation to" nexus requirement between carrying or using the firearm and the drug-trafficking crime. "In relation to" means that the firearm must have some "purpose or effect with respect to the drug trafficking crime; [thus,] its presence or involvement cannot be the result of accident or coincidence." *Smith*, 508 U.S. at 237–38. Okechuku argues that the evidence fails to show that he intended

---

[8] Okechuku argues that because the evidence was insufficient with respect to the drug-trafficking conspiracy, the firearm convictions should be vacated. However, because we conclude that the evidence at trial was sufficient to support Okechuku's drug-trafficking conspiracy conviction, we reject this argument.

to hire armed guards; he argues that it was just "happenstance" that the security guards were armed and that the presence of firearms was "unrelated" to and had no "purpose or effect" with respect to the drug-trafficking crime.

We conclude that the evidence presented at trial is sufficient to support the "in relation to" nexus requirement of Okechuku's firearm convictions. This evidence includes the testimony of Sam Donnell, one of the armed security guards, who testified that Ezenagu approached him and said that he "might need the services of an armed security guard" and that he would have to discuss the quoted price with his "partner," *i.e.*, Okechuku. Ezenagu testified that Okechuku ultimately made the decision to hire armed guards. Given the large amounts of cash held at the clinic and the fact that there were drug dealers that frequented the clinic, a reasonable jury could have inferred that Okechuku hired the armed guards in order to protect the proceeds and personnel of the clinic's pill mill operation. Indeed, Ezenagu testified that they "needed to hire a security guard [because] there was too much money going on in [*sic*] the place." Okechuku argues that "it can be inferred" from the evidence that the fact that the security guards were armed was just a coincidence. However, all "inferences that can be drawn from the evidence should be resolved in favor of the jury verdict." *Moreno-Gonzalez*, 662 F.3d at 372. Given this evidence, a reasonable jury could have inferred that Okechuku hired the armed guards in order to protect the proceeds and personnel of the clinic's pill mill business.[9] *See Santillana*, 604 F.3d at 195.

Okechuku also argues that the evidence was insufficient to support the jury's determination that the firearms were "brandished" because there was

---

[9] Okechuku also argues that the government relied on improper expert testimony to prove that the firearm was related to the drug-trafficking conspiracy. We address this issue in Part III.A.1, *infra.*

no evidence that the guards intended to intimidate anyone by carrying the firearms. "[B]randish means, with respect to a firearm, to display all or part of the firearm, or otherwise make the presence of the firearm known to another person, in order to intimidate that person, regardless of whether the firearm is directly visible to that person." 18 U.S.C. 924(c)(4). Donnell testified that his job was to control the unruly crowds of patients and to prevent robberies. He also testified that if there was a fight, robbery, or any type of chaos, he was there to quell it with his firearm. Donnell also testified that the firearm was displayed every day he came to work at the clinic. On these facts, a reasonable jury could have found that the security guards visibly wore firearms with the intent to intimidate others at the clinic. *See Moreno-Gonzalez*, 662 F.3d at 372.

## III. Evidentiary Challenges

Okechuku, Iwuoha, and Rutledge each raise challenges regarding the evidence admitted at trial. "When a district court's determination as to the admissibility of evidence is questioned on appeal, our applicable standard of review is abuse of discretion." *United States v. O'Keefe*, 426 F.3d 274, 280 (5th Cir. 2005); *see also United States v. Wise*, 221 F.3d 140, 148 (5th Cir. 2000) ("[T]he proper standard of reviewing a district court's admission or exclusion of expert testimony is abuse of discretion."). The government argues as to each of Appellees' evidentiary challenges that even if the district court erred, the error was harmless. *See Wise*, 221 F.3d at 157. Under this harmless error analysis, we will not reverse "[u]nless there is a reasonable possibility that the improperly admitted evidence contributed to the conviction." *United States v. Mendoza-Medina*, 346 F.3d 121, 127 (5th Cir. 2003). The government bears the burden of demonstrating that the error was harmless. *United States v. Akpan*, 407 F.3d 360, 377 (5th Cir. 2005).

No. 16-10386

"We review for plain error objections to evidence that were not made before the district court." *United States v. McGee*, 821 F.3d 644, 646 (5th Cir. 2016). Under our plain error review, the appellant must show that: (1) there was an error; (2) the error was clear or obvious; (3) the error affected his or her substantial rights; and (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings such that we should exercise our discretion to reverse. *See Delgado*, 672 F.3d at 329–31.

We address each of the appellants' evidentiary challenges in turn.[10]

## A. Okechuku's Evidentiary Challenges

### 1.

Okechuku argues that the district court erred under Federal Rule of Evidence 704 by allowing the government's expert witness, ATF Special Agent Gordon, to testify as to a legal conclusion regarding the firearm offenses for which Okechuku was found guilty. At trial, Gordon was permitted by the district court to testify as an expert with regard to the use of firearms in the drug trade.[11] Gordon has investigated hundreds of drug-trafficking offenses in his 18-year career, including several pill mills. During his testimony, the government asked Gordon the following:

> Based upon the evidence that you saw and the photographs, the videotape, and the information that was made available to you, do you have an opinion as to whether or not those security guards

---

[10] Both Okechuku and Iwuoha argue that their convictions require reversal under the cumulative error doctrine. The cumulative error doctrine "provides that an aggregation of non-reversible errors (*i.e.*, plain errors failing to necessitate reversal and harmless errors) can yield a denial of the constitutional right to a fair trial, which calls for reversal." *United States v. Munoz*, 150 F.3d 401, 418 (5th Cir. 1998). Cumulative error justifies reversal only when errors "so fatally infect the trial that they violated the trial's fundamental fairness." *Delgado*, 672 F.3d at 344. "[T]he possibility of cumulative error is often acknowledged but practically never found persuasive." *Id.* Here, the alleged errors do not rise to the level of cumulative error.

[11] Okechuku does not challenge Agent Gordon's designation as an expert witness.

13

were using, carrying, and brandishing a firearm in furtherance of
a drug trafficking activity?

Gordon responded "Absolutely." Defense counsel objected, and the district court judge called counsel to the bench. After the bench conference, the government was allowed to continue its line of questioning. Gordon was asked whether, "assuming that the jury in this case were to find that . . . a pill mill was being operated out of the [the clinic] . . . [do you] have an opinion as to whether or not you believe that firearms were being used to protect this . . . drug enterprise?" Gordon responded "Yes, sir." When asked what his opinion was, Gordon added:

> My opinion is that the firearms used in this particular operation are very similar to cases that I've investigated in the past where people would hire security guards or even law enforcement officers to protect the drug trafficking activity and those individuals carrying those firearms were using those firearms in furtherance of the drug trafficking activity and those individuals who hired those security guards or law enforcement officers were also using those firearms in furtherance of the drug trafficking activity.

Okechuku argues that the district court erred by admitting this portion of Gordon's testimony because it states a legal conclusion and circumvented the jury's decision-making function by telling it how to decide the case.

We have repeatedly addressed the proper bounds of expert testimony. *See, e.g.*, *United States v. Haines*, 803 F.3d 713, 728–34 (5th Cir. 2015); *United States v. Thomas*, 847 F.3d 193, 206 (5th Cir. 2017). We have especially urged the government to use caution when case agents also function as experts because the expert label "confers upon [the agent] the aura of special reliability and trustworthiness surrounding expert testimony." *Haines*, 803 F.3d at 730 (quoting *United States v. Dukagjini*, 326 F.3d 43, 53 (2d Cir. 2003)). An expert witness is permitted to give his opinion on an "ultimate issue" of fact, assuming he is qualified to do so. *Goodman v. Harris Cnty.,* 571 F.3d 388, 399 (5th Cir.

2009). However, an expert witness is not permitted to offer conclusions of law. Fed. R. Evid. 704; *see also Goodman*, 571 F.3d at 399 ("[A]n expert may never render conclusions of law[.]"). This rule and the other Federal Rules of Evidence "afford ample assurances against the admission of opinions which would merely tell the jury what result to reach." *Salas v. Carpenter*, 980 F.2d 299, 305 n.4 (5th Cir. 1992); Fed. R. Evid. 704 advisory committee's notes (1972).

We recognize that there is often a fine line between admissible expert testimony pertaining to inferences that can be drawn from the facts of a case and inadmissible legal conclusions. However, the government must resist the temptation to test the boundaries of that line. Here, the government solicited testimony from Gordon that the security guards at the clinic were "similar to" other cases that he had investigated in which the security guards "were using those firearms in furtherance of the drug trafficking activity and those individuals who hired those security guards . . . were also using those firearms in furtherance of the drug trafficking activity." Gordon's use of the phrase "in furtherance of the drug trafficking activity" stated a legal conclusion that should have been left to the jury to decide. The fact that Gordon was actually discussing past cases he had investigated—and not technically discussing Okechuku's actions in this case—is of no matter. *See United States v. Alvarez*, 837 F.2d 1024, 1030 (11th Cir. 1988) ("When the expert is a government law enforcement agent testifying on behalf of the prosecution about participation in prior and similar cases, the possibility that the jury will give undue weight to the expert's testimony is greatly increased.").

Even though Gordon's testimony ventured into forbidden territory and its admission constituted error, we conclude that the error was harmless. As discussed above, even excluding Gordon's testimony, there was ample evidence

15

to support Okechuku's conviction under the firearm counts. The testimony of Ezenagu and Donnell show that Ezenagu acted as Okechuku's agent in seeking the services of armed guards at the clinic. Ezenagu also testified that the purpose of having the armed guards was to protect the high amount of cash coming into the clinic. Finally, Donnell testified that he and the other security guards visibly wore their firearms every day at the clinic and that he was there to quell any disturbances with his firearm. Because of this evidence supporting the firearm conviction, allowing Gordon's testimony was harmless error. *See Haines*, 803 F.3d at 732 (holding that the error of admitting an agent's impermissible testimony was harmless because the record, even excluding the impermissible testimony, was "replete with evidence" that defendants had participated in the conspiracy); s*ee also United States v. Williams*, 343 F.3d 423, 435 n.11 (5th Cir. 2003) (affirming convictions based on the strength of the evidence, despite testimony admitted in violation of Rule 704).

### 2.

Okechuku argues that the district court erred when it allowed FBI Special Agent Pekala to testify on cross-examination that Jerry Reed, a non-testifying co-defendant, told him that a Post-It note was an agreement between Okechuku and Reed. Okechuku contends that in admitting this evidence, the district court violated his Sixth Amendment right to confrontation under *Bruton v. United States*, 391 U.S. 123, 137 (1968). Okechuku concedes that he did not lodge an objection to Pekala's testimony, therefore we apply plain error review. *See McGee*, 821 F.3d at 646.

At trial, FBI Special Agent Pekala testified that Jerry Reed, a non-testifying co-defendant, had told him that a hand-written Post-It note was evidence of the conspiratorial agreement between Reed and Okechuku. The Post-It note read: "Jerry 170 1 Free Every 10[.]" During Pekala's testimony, he

testified that he found the note in the trash during his search of the clinic. He also testified that the note "appears to be an agreement between Jerry Reed and the clinic" and that he thought "the 170 is referring to the cost of an office visit. For every ten patients, [Jerry Reed] gets one—I am assuming—prescription for free." During cross-examination, Pekala was asked how he knew it was an agreement. Pekala responded that Ezenagu and Jerry Reed told him it was an agreement. He was asked, "And that is the basis of you saying what you said in this courtroom?" Pekala responded, "Well, I thought it was that before that.'" Okechuku argues that this testimony violated his Sixth Amendment rights because it deprived him of the opportunity to confront Jerry Reed, the real source of the testimony that was being presented to the jury through Pekala.

Even assuming *arguendo* that the district court erred and that the error was plain, Okechuku has not demonstrated that the error affected his substantial rights. A defendant demonstrates that an error had an effect on his substantial rights when he shows a reasonable probability that the jury, absent the error, would have acquitted him. *See United States v. Powell*, 732 F.3d 361, 379 (5th Cir. 2013). Pekala's testimony pertaining to the Post-It note did not affect Okechuku's substantial rights because, as discussed above in Part II, *supra*, there is ample evidence supporting Okechuku's drug trafficking conspiracy conviction. We conclude that Okechuku's *Bruton* argument fails on the third prong of plain error review. *See Powell*, 732 F.3d at 379.

**3.**

Okechuku argues that the district court erred when it permitted the government to impeach him during his testimony regarding the FBI investigating him for possible insurance fraud. During its cross-examination of Okechuku, the government asked Okechuku whether he "was aware of the

No. 16-10386

FBI's actions" regarding an insurance fraud investigation into a business that Okechuku owned. Okechuku denied any knowledge of the government's assertion, and the government did not inquire further. Okechuku contends that the district court erred in allowing the government to ask him this question on cross-examination because the government failed to provide a good-faith basis for the question and the probative value of the question was substantially outweighed by the danger of unfair prejudice. We review this challenge for plain error.[12]

Questions about past specific instances of misconduct pertaining to fraud are admissible under Federal Rule of Evidence 608(b) because they are "clearly probative of truthfulness or untruthfulness." *United States v. Tomblin*, 46 F.3d 1369, 1389 (5th Cir. 1995). However, when admitting such testimony, the danger of unfair prejudice should not substantially outweigh the testimony's probative value. Fed. R. Evid. 403. The district court has substantial discretion in determining whether the probative value of the testimony substantially outweighs the danger of unfair prejudice. *See United States v. Farias-Farias*, 925 F.2d 805, 809 & 811 n.11 (5th Cir. 1991).

We are unpersuaded by Okechuku's contention that the government failed to provide a good-faith basis for its question about the FBI investigation.

---

[12] The parties agree that we should apply the plain error standard of review to Okechuku's argument regarding the good-faith basis for the government's question about the FBI investigation. However, the parties disagree about whether Okechuku preserved his argument that he was unfairly prejudiced by the question about the FBI investigation. Because we conclude that Okechuku raised this specific objection for the first time on appeal, we review the district court's actions for plain error. *United States v. Hernandez-Martinez*, 485 F.3d 270, 273 (5th Cir. 2007) (reviewing for plain error where the district court "was not on notice of the arguments" the defendant presented on appeal). Moreover, even if we were to review the district court's allowance of this question for abuse of discretion, Okechuku has not demonstrated that the district court abused its discretion in allowing questions pertaining to the FBI investigation.

No. 16-10386

Whether a good-faith basis exists for the government's question is an issue of fact. If Okechuku had timely raised the issue of whether there was a good-faith basis for the questioning, the district court could have held a hearing during which the government could have presented evidence. Because Okechuku did not raise this issue before the district court, the district court did not plainly err by allowing the testimony. *See United States v. Illies*, 805 F.3d 607, 609 (5th Cir. 2015) ("In this circuit . . . questions of fact capable of resolution by the district court can never constitute plain error.").

Okechuku also argues that the government's question was unfairly prejudicial because there was no preliminary showing that he actually committed the acts alleged. But this argument is similarly unpersuasive. Okechuku asks for what Rule 608(b) prohibits—extrinsic evidence showing that he committed the prior acts. *See* Fed. R. Evid. 608(b). We have specifically held that the basis for questions under Rule 608(b) does not have to "be proved as a fact before a good faith inquiry can be made." *United States v. Nixon*, 777 F.2d 958, 970 (5th Cir. 1985); *see also Tomblin*, 46 F.3d at 1389. Accordingly, we conclude that the district court did not commit plain error by allowing the government to inquire about the FBI investigation.

### B. Iwuoha's Evidentiary Challenges

### 1.

Iwuoha argues that the district court erred when it made a comment before the jury that had the effect of lessening the government's standard of proof. During the defense's direct examination of defense expert Dr. Warfield, the district court made the following comment:

> Counsel, I still don't—that's just a variation of that last question.
> I don't see how that is going to help this jury answer the issues
> before them, whether the prescriptions were properly issued in

this case. That's the issue the jury is going to have to answer. Stick with that.

Iwuoha argues that the question before the jury was not whether the prescriptions were *properly* issued but whether they were *legally* issued. Iwuoha argues that the district court's comment led the jury to believe that mere negligent care in issuing prescriptions warranted a conviction and therefore impacted his right to a fair trial. Because Iwuoha did not object to the district court's statement, we review the district court's statement for plain error. *See McGee*, 821 F.3d at 646.

We are unpersuaded that the district court's statement amounts to plain error because Iwuoha has failed to show that the comment plainly misstated the law nor has he shown that he was prejudiced by the comment. In the context of the district court's statement, the difference between *properly* issued and *legally* issued appears to be merely semantic in nature. The district court never indicated that there was a distinction between the two terms in the way it used them and therefore did not lower the standard by using the word "properly" in the comment to defense counsel. However, even assuming *arguendo* that the district court misstated the law, Iwuoha has failed to show that he was prejudiced by a single comment to defense counsel during a two-week jury trial. Any harmful effect this comment might have had on the jury was cured by the jury instructions, which correctly charged that it must find that the defendants "unlawfully distributed or dispensed hydrocodone . . . outside the scope of professional practice."

## 2.

Iwuoha also argues that both the prosecutor and the government's expert witness misled the jury by indicating that the act of pre-signing a prescription for hydrocodone is a felony in Texas. Because Iwuoha did not raise

this objection at trial, we apply plain error review. *See United States v. Fields,* 483 F.3d 313, 360 (5th Cir. 2007).

Section 481.074 of the Texas Health & Safety Code provides that "a person may not dispense a controlled substance in Schedule III or IV . . . without a written . . . prescription of a practitioner . . . . A prescription under this subsection must comply with other applicable state and federal laws." Tex. Health & Safety Code § 481.074(g). Iwuoha acknowledges that the prescriptions he gave to patients with pre-signed prescriptions were Schedule III drugs. And federal regulations provide that "[a]ll prescriptions for controlled substances shall be dated as of, and signed on, the day when issued[.]" 21 C.F.R. § 1306.05. Because Texas and federal law state that it is unlawful to dispense the drugs Iwuoha was dispensing without a prescription signed on the same day they were prescribed, we conclude that there was no error here, plain or otherwise.

### C. Rutlege's Evidentiary Challenge

In the only issue he raises on appeal, Rutledge argues that his conviction was based on false testimony in violation of *Napue v. Illinois*, 360 U.S. 264 (1959). Prior to trial, one of the prosecutors and two agents interviewed Nancy Gapen, the manager of the property that the clinic leased. The prosecutor recorded notes from the interview on his laptop, including a note that stated, "Masses of traffic, knowing it was a pain med center; my bias was the dude's [*sic*] from Nigeria, having gone through what I saw at Estate Lane; more sensitized to the issues[.]" Later, when the prosecutor reviewed his notes in preparation for trial, he could not remember Gapen having said anything regarding a bias. The prosecutor asked the two agents who had accompanied him during the interview whether they could recall what was said, and neither of them could remember Gapen saying anything like what was written in the

prosecutor's notes. The prosecutor also asked Gapen, and she stated that she did not remember saying anything like what the prosecutor had written. Even though no one could remember that statement being said, the prosecutor disclosed the note to defense counsel.

At trial, on direct examination, the prosecutor tried to clear up any confusion by explicitly asking Gapen whether she had a bias against Nigerians, to which she responded, "No." During cross-examination, counsel for Okechuku asked her whether she had expressed a bias towards Nigerians during a meeting with the prosecutor. She responded, "No, I did not." Later, outside the presence of the jury, Oti and Okechuku moved to strike Gapen's testimony on the ground that she falsely testified that she did not have a bias against Nigerians. Rutledge joined the motion. The district court denied the motions to strike, but permitted defense counsel to recall Gapen so they could cross-examine her about her purported bias.

Rutledge now argues that the government violated *Napue* in not striking Gapen's testimony. We review Rutledge's challenge for plain error.[13]

"In order to establish a *Napue* violation, the defendant must show (1) the statements in question are actually false; (2) the prosecution knew that the statements were false; and (3) the statements were material." *United States v.*

---

[13] The parties disagree as to whether the abuse of discretion or plain error standard of review should apply to this issue. Rutledge argues that the abuse of discretion standard applies because, at the conclusion of Gapen's testimony, the defense asked that her testimony be stricken because she had allegedly falsely testified about her bias. However, at no point did Rutledge or the other defendants allege that the government knew Gapen testified falsely in violation of *Napue*. Further, Rutledge did not object to the district court's finding that the prosecutor acted properly and in good faith. Because Rutledge never alleged that the government knew Gapen testified falsely—an element under *Napue*—we review Rutledge's *Napue* argument for plain error. *See Hernandez-Martinez*, 485 F.3d at 273. However, even if we were to determine that Rutledge preserved his challenge under *Napue* and were to review his argument under an abuse of discretion standard of review, we would conclude that he does not prevail under that standard.

*Haese*, 162 F.3d 359, 365 (5th Cir. 1998). Rutledge has failed to satisfy any of these three prongs. First, Rutledge has not shown that Gapen's testimony that she harbors no bias against Nigerians is actually false. None of the people present when the notes were taken remember Gapen actually making the statement and Gapen testified under oath that she did not have a bias. Second, even if Gapen's testimony was actually false, Rutledge has not shown that the government knew that her testimony was false. The prosecutor told the district court that he doubted that Gapen actually said the statement and the district court concluded that the prosecutor was credible and acted in good faith. Third, Rutledge has not shown that the false statement was material.[14] Even if Gapen's statement was excluded, Gapen's testimony was cumulative of other evidence at trial and there was sufficient evidence presented at trial of Rutledge's guilt.

## IV. Deliberate Ignorance Instruction

Okechuku, Oti, and Iwuoha argue that the district court erred by giving the jury a deliberate ignorance instruction, thus allowing the jury to conclude that each of them knowingly joined the conspiracy if it found that they "deliberately closed [their] eyes to what would otherwise have been obvious to [them]." Okechuku, Oti, and Iwuoha contend that the instruction is inappropriate in conspiracy cases and also that the instruction was not supported by the evidence.

In the district court, Appellants only objected to the deliberate ignorance instruction on the basis that the instruction was inappropriate in conspiracy cases. At no time did Appellants argue in the district court that the evidence

---

[14] The Supreme Court has defined "material" in terms of a "reasonable probability" of a different outcome if the evidence or testimony was excluded. *Kyles v. Whitley*, 514 U.S. 419, 434 (1995).

did not support the instruction. Accordingly, we review for abuse of discretion Appellants' argument that the deliberate ignorance instruction is inappropriate in conspiracy cases. *See United States v. Fuchs*, 467 F.3d 889, 901 (5th Cir. 2006). We review for plain error Appellants' argument that the evidence presented at trial did not support giving the instruction to the jury. *See United States v. Scott*, 159 F.3d 916, 923 (5th Cir. 1998).

We reject Appellants' first argument that a deliberate ignorance instruction cannot be given in conspiracy cases. We have held that the deliberate ignorance instruction is consistent with the elements of conspiracy. *See United States v. Inv. Enters.*, 10 F.3d 263, 269 (5th Cir. 1993) ("To the extent that the instruction is merely a way of allowing the jury to arrive at the conclusion that the defendant knew the unlawful purpose of the conspiracy, it is hardly inconsistent with a finding that the defendant intended to further the unlawful purpose."). Indeed, we have consistently upheld deliberate ignorance instructions in the conspiracy context, so long as sufficient evidence supported the instruction. *See Scott*, 159 F.3d at 924 & n.6 (citing cases); *see also*, *United States v. Brown*, No 16-3033, slip op. at 4 (5th Cir. Sept. 13, 2017) (collecting conspiracy cases where deliberate ignorance instruction was properly given).

Regarding Appellants' second argument, the proper factual basis for the deliberate ignorance instruction exists "if the record supports inferences that (1) the defendant was subjectively aware of a high probability of the existence of illegal conduct; and (2) the defendant purposely contrived to avoid learning of the illegal conduct." *Fuchs*, 467 F.3d at 902. "In deciding whether the evidence reasonably supports the jury charge, the court reviews the evidence and all reasonable inferences that may be drawn therefrom in the light most favorable to the government." *Id.* at 901.

No. 16-10386

"We have often cautioned against the use of the deliberate ignorance instruction." *Mendoza-Medina*, 346 F.3d at 127. In *United States v. Skilling*, we noted that such an instruction should be given only in "'rare' instance[s]" and observed:

> The concern is that once a jury learns that it can convict a defendant despite evidence of a lack of knowledge, it will be misled into thinking that it can convict based on negligent or reckless ignorance rather than intentional ignorance. In other words, the jury may erroneously apply a lesser *mens rea* requirement: a "should have known" standard of knowledge.

*Skilling*, 554 F.3d at 548–49, *rev'd on other grounds*, 561 U.S. 358 (2010). "The instruction is appropriate *only* in the circumstances where a defendant claims a lack of guilty knowledge and the proof at trial supports an inference of deliberate indifference." *United States v. Kuhrt*, 788 F.3d 403, 417 (5th Cir. 2015).

Appellants argue that the instruction was inappropriate because, with the evidence before it, the jury had the choice of deciding whether Appellants were *actually* aware of the pill mill activities or *actually* not aware of the activities. We agree. "[T]he district court should not instruct the jury on deliberate ignorance when the evidence raises only the inferences that the defendant had actual knowledge or no knowledge at all of the facts in question." *Mendoza-Medina*, 346 F.3d at 133–34. The government has failed to cite to specific evidence in the record that demonstrates that Okechuku, Oti, or Iwuoha purposely contrived to avoid learning of the pill mill activities. This showing is necessary as to *each defendant* to justify the use of the deliberate ignorance instruction. A boilerplate deliberate ignorance instruction that applies to all defendants in a case is inappropriate absent a showing that the proper factual basis exists as to each defendant. *See Fuchs*, 467 F.3d at 902.

25

No. 16-10386

Where the government relies on evidence of actual knowledge, the deliberate ignorance instruction is not appropriate. *Kuhrt*, 788 F.3d at 417.

Rather than being a case of deliberate ignorance, the government's case against Okechuku, Oti, and Iwuoha was that they actually knew of the pill mill operations taking place at the clinic.[15] As to Okechuku, the evidence demonstrated that he kept incredibly close tabs on the clinic, watching surveillance video remotely as well as frequently reviewing the amount of cash the clinic brought in each day and the high number of patients that his clinic saw—a number of patients that the government expert testified would have been "impossible" for a provider practicing within the normal scope of professional practice to see. The evidence also showed that Okechuku was well aware of the frequent presence of Jerry Reed and his cohorts at the clinic and of the clientele Jerry Reed brought in. Okechuku met several times alone with Jerry Reed and Ezenagu in his office. Critically, Ezenagu testified that "Okechuku knew from day one" that Jerry Reed was bringing illegitimate patients to the clinic.

The government's case as to Iwuoha was also that he had actual knowledge of the pill mill scheme. The government presented evidence that even though Iwuoha was not licensed to practice medicine, the clinic paid him more than eight times the amount he was paid at his other job as an anesthesiologist technician. The evidence at trial showed the short, four-to-eight-minute examinations that Iwuoha had with his patients. Of the 87 patients that Iwuoha saw in a two-day sample period, he prescribed all 87 of them hydrocodone. Ezenagu testified that he saw Jerry Reed go into Iwuoha's

---

[15] Indeed, at oral argument, the government stated that there was "overwhelming evidence as to actual knowledge" as to appellants.

office to meet with Iwuoha, and that based on Ezenagu's experience at the clinic, he believed Iwuoha knew what Jerry Reed and the other drug dealers were doing with the drugs from the clinic.

Finally, the government's case as to Oti was also that she had actual knowledge of the pill mill scheme. The government presented evidence at trial that Oti had worked for a pill mill in the past and was therefore familiar with how they operated. An undercover agent testified that she was treated by Oti and that Oti watched television during the entire examination and never touched her. Oti's patient visits were consistently short and her medical notes were sparse. There was also evidence that Oti was familiar with Jerry Reed and knew what he was doing, including video evidence of her meeting with Jerry Reed in her office and records showing that they had spoken on the phone at least three times. Further, Ezenagu testified that, based on his time and experience at the clinic, he believed Oti knew what Jerry Reed and his cohorts were doing at the clinic. Critically, as to each Okechuku, Iwuoha, and Oti, the government presented testimony of other clinic staff members who had considerably less medical training and experience than the appellants who testified that they knew that the clinic was operating as a pill mill.

Even though it was error for the district court to give the deliberate ignorance instruction when the government's theory was that Okechuku, Oti, and Iwuoha actually knew of the pill mill operation, we have held "that giving the instruction is harmless where there is substantial evidence of actual knowledge." *Kuhrt*, 788 F.3d at 417; *see also United States v. St. Junius,* 739 F.3d 193, 204–05 (5th Cir. 2013) ("Even if the district court errs in its decision to give the deliberate ignorance instruction, any such error is harmless where substantial evidence of actual knowledge is presented at trial."). That is the situation here. As discussed above, there was ample evidence presented at

trial, including Ezenagu's testimony, that Okechuku, Oti, and Iwuoha each knew of the illegal purposes for which Jerry Reed and others used the clinic's services. Therefore, we conclude that any error in using the instruction was harmless and that Okechuku, Oti, and Iwuoha cannot show that the district court plainly erred in giving the instruction. *Kuhrt*, 788 F.3d at 418 ("[T]here was testimony that Appellants were actual participants in the illegal activity. Therefore, the error was harmless.").

We emphasize once again, however, that the deliberate ignorance instruction should rarely be given. *Kuhrt*, 788 F.3d at 417; *United States v. Faulkner*, 17 F.3d 745, 766 (5th Cir. 1994); *United States v. Ojebode*, 957 F.2d 1218, 1229 (5th Cir. 1992); *see also United States v. Cartwright*, 6 F.3d 294, 301 (5th Cir. 1993) ("Because the deliberate ignorance instruction may confuse the jury, the instruction should rarely be given."). The instruction is not a failsafe mechanism that the government can implement to relieve itself of proving the *mens rea* requirement of a crime. *See Kuhrt*, 788 F.3d at 417 ("The proper role of the deliberate ignorance instruction is not as a backup or supplement in a case that hinges on a defendant's actual knowledge."). We caution the government that, while this instance of misapplying the deliberate ignorance instruction amounted to harmless error, that will not always be the case.

## V. Challenges to Sentencing

Okechuku argues that the quantity of drugs attributed to him for purposes of sentencing was excessive. At sentencing, Okechuku was held accountable for all of the prescriptions written at the clinic because he was the clinic's owner and operator and its only licensed physician. The presentence report (PSR) calculated that Okechuku was responsible for 1,314,300 hydrocodone pills, 39,289 Xanax pills, and 5,558 units of Promethazine with

Codeine. After calculating a marijuana equivalent, Okechuku was ultimately held accountable for 999.99 kilograms of marijuana.[16]

Okechuku preserved this challenge by objecting to the PSR's drug-quantity determination. Therefore, we review the district court's calculation of the quantity of drugs—a factual determination—for clear error. *United States v. Betancourt*, 422 F.3d 240, 246 (5th Cir. 2005). We will deem the district court's factual findings clearly erroneous only if, based on the entirety of the evidence, we are left with the definite and firm conviction that a mistake has been committed. *United States v. Akins*, 746 F.3d 590, 609 (5th Cir. 2014).

Okechuku first argues that the quantity of drugs attributed to him is excessive because the government failed to prove that all of the clinic's patients who were given prescriptions were given them without a legitimate medical purpose. Okechuku cites to evidence that the clinic treated legitimate patients in addition to the patients Jerry Reed brought in. *Id.* However, just because a patient was not brought in by Jerry Reed does not mean that the prescription issued to that patient was legitimate. The district court found that *all* of the clinic's prescriptions were issued outside the scope of professional practice and without a legitimate medical purpose. Because there is evidence that all of the visits with patients lasted 4–8 minutes, that few, if any, notes were taken, and that clinic employees prescribed hydrocodone to almost every patient, the district court's finding is "plausible in light of the record as a whole" and is

---

[16] When an offense involves several types of controlled substances, the quantities of differing controlled substances are combined using a marijuana equivalent. *See* USSG § 2D1.1, comment. (n.8(B)). Using this method, the PSR determined that the three controlled substances were the equivalent of 1,316.79 kilograms of marijuana—the hydrocodone was converted to 1,314,000 grams of marijuana, the Xanax to 2455 grams, and the Promethazine with Codeine to 34.73 grams. Okechuku was ultimately held accountable for only 999.99 kilograms, however, because the combined weight of all Schedule III substances is capped at 999.99 kilograms of marijuana. *See* USSG § 2D1.1, comment. (n.8(D)).

therefore not clearly erroneous. *United States v. Coleman*, 609 F.3d 699, 708 (5th Cir. 2010).

Okechuku also argues that there were many prescriptions issued without his knowledge or authorization, for which he should not be held responsible. Okechuku cites Ezenagu's testimony that Jerry Reed sometimes paid clinic employees to provide extra prescriptions. However, this argument is unpersuasive because those prescriptions that were issued without Okechuku's knowledge would not have been included in the clinic's seized records upon which Okechuku's total drug quantity was based.

Finally, Okechuku argues that the PSR should not have relied on Agent Pekala's determination of quantities because he is not a medical doctor and therefore cannot make the determination as to which prescriptions were medically necessary. However, Pekala did not ultimately determine whether the prescriptions were medically necessary—the jury made this determination after considering substantial evidence showing that the clinic operated as a pill mill. An expert is not required to make this determination. *See United States v. Armstrong*, 550 F.3d 382, 388–89 (5th Cir. 2008), *overruled on other grounds by United States v. Balleza*, 613 F.3d 432, 433 (5th Cir. 2010) ("[E]xpert testimony is not always required in order to show that a physician is acting for other than proper medical purposes.").

Even assuming *arguendo* that there was an error at sentencing in calculating Okechuku's drug quantity, any such error was harmless. In order to have any effect on Okechuku's base offense level, the 1,316.79 kilograms of marijuana equivalent for which Okechuku was held accountable would have

to have been reduced to less than 700 kilograms of marijuana equivalent.[17] Therefore, almost half of all of the clinic's prescriptions would need to be deemed legitimate in order to reduce Okechuku's sentence. However, the evidence does not support this low number. Therefore, we conclude that the district court did not err in calculating Okechuku's drug quantity amount.[18]

## VI. Conclusion

For the foregoing reasons, the district court's judgment and sentence are AFFIRMED.

---

[17] The district court determined a base offense level of 30 based on the already reduced 999.99 kilograms of marijuana, which was "at least 700 kilograms, but less than 1,000 kilograms of marijuana." USSG § 2D1.1(c)(5).

[18] Oti and Iwuoha both dispute the district court's application of the sentencing enhancement under U.S.S.G. § 2D1.1(b)(1), arguing that it is unconstitutional to base a defendant's sentencing guidelines calculation on acquitted conduct. But, as they concede, the issue is foreclosed. *United States v. Watts*, 519 U.S. 148, 157 (1997) (holding that "a jury's verdict of acquittal does not prevent the sentencing court from considering conduct underlying the acquitted charge, so long as that conduct has been proved by a preponderance of the evidence"); *see also United States v. Grace*, 640 F. App'x 298, 300 (5th Cir. 2016) ("*Watts* continues to remain controlling law.").